*THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE FOLLOWING COMBINED CHAPTER 11 DISCLOSURE STATEMENT AND PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PROVISIONALLY APPROVED BY THE BANKRUPTCY COURT.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AeroCision Parent, LLC, *et al.*,[1] | Case No. 23-11032 (KBO) |
| Debtors. | (Jointly Administered) |

## COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF LIQUIDATION OF AEROCISION PARENT, LLC AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION

**Dated: December 14, 2023**

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Michael R. Nestor, Esq. (No. 3526)
Andrew L. Magaziner, Esq. (No. 5426)
Elizabeth S. Justison, Esq. (No. 5911)
Shella Borovinskaya, Esq. (No. 6758)
Emily C.S. Jones, Esq. (No. 7071)
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Emails: mnestor@ycst.com
        amagaziner@ycst.com
        ejustison@ycst.com
        sborovinskaya@ycst.com
        ejones@ycst.com

*Counsel to the Debtors and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: AeroCision Parent, LLC (8828); AeroCision, LLC (0509); and Numet Machining Techniques, LLC (3162). The Debtors' service address is 12-A Inspiration Lane, Chester, CT 06412.

# TABLE OF CONTENTS

**Page**

DISCLAIMER ...................................................................................................1

INTRODUCTION ..............................................................................................2

ARTICLE  I DEFINED TERMS AND RULES OF INTERPRETATION ........................2

ARTICLE  II CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES ...................................................................................................17

    2.1       Classification of Claims and Interests.......................................................17

ARTICLE  III BACKGROUND AND DISCLOSURES ..................................................19

    3.1       General Background ................................................................................19
    3.2       Events Leading to Chapter 11..................................................................24
    3.3       The Chapter 11 Cases .............................................................................25

ARTICLE  IV CONFIRMATION AND VOTING PROCEDURES.............................30

    4.1       Confirmation Procedure...........................................................................30
    4.2       Procedure for Objections .........................................................................30
    4.3       Requirements for Confirmation ...............................................................31
    4.4       Classification of Claims and Interests......................................................31
    4.5       Impaired Claims or Interests ...................................................................32
    4.6       Confirmation Without Necessary Acceptances; Cramdown ...................32
    4.7       Feasibility................................................................................................33
    4.8       Best Interests Test and Liquidation Analysis...........................................34
    4.9       Acceptance of this Plan............................................................................34

ARTICLE  V CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING35

    5.1       This Plan May Not Be Accepted ..............................................................35
    5.2       This Plan May Not Be Confirmed ............................................................35
    5.3       Distributions to Holders of Allowed Claims Under this Plan May Be Inconsistent with Projections ..................................................................36
    5.4       Objections to Classification of Claims ....................................................36
    5.5       Failure to Consummate this Plan .............................................................37
    5.6       Plan Releases May Not Be Approved.......................................................37
    5.7       Reductions to Estimated Creditor Recoveries ..........................................37

5.8     Certain Tax Considerations...................................................................37

ARTICLE  VI TREATMENT OF UNCLASSIFIED CLAIMS........................................37

6.1     General Administrative Expenses.........................................................37
6.2     Professional Fees ................................................................................38
6.3     DIP Claims..........................................................................................39
6.4     Priority Tax Claims.............................................................................39

ARTICLE  VII TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ...........39

7.1     Class 1: Priority Non-Tax Claims.......................................................39
7.2     Class 2: Other Secured Claims ...........................................................39
7.3     Class 3: First Lien Claims...................................................................40
7.4     Class 4: General Unsecured Claims.....................................................40
7.5     Class 5: Intercompany Claims ............................................................40
7.7     Reservation of Rights Regarding Claims and Interests .......................40

ARTICLE  VIII ACCEPTANCE OR REJECTION OF THIS PLAN .............................40

8.1     Classes Entitled to Vote .....................................................................40
8.2     Acceptance by Impaired Classes of Claims or Interests ......................40
8.3     Presumed Acceptance by Unimpaired Classes ...................................41
8.4     Presumed Rejections by Impaired Classes ..........................................41
8.5     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.........41
8.6     Subordinated Claims...........................................................................41
8.7     Controversy Concerning Impairment ..................................................41
8.8     Elimination of Vacant Classes ............................................................41

ARTICLE  IX IMPLEMENTATION OF THIS PLAN ...................................................41

9.1     Implementation of this Plan ................................................................41
9.2     Source of Consideration......................................................................42
9.3     Vesting of Wind Down Assets.............................................................42
9.4     Termination of Directors, Officers, and Managers and Appointment of Plan Administrator ..............................................................................42
9.5     Wind-Up and Dissolution of the Debtors ...........................................42
9.6     Plan Administrator and Plan Administration Agreement .....................42
9.7     Wind Down Organizational Documents...............................................43
9.8     Wind Down Budget .............................................................................43
9.9     Distributions by Plan Administrator ....................................................44
9.10    Limitation of Liability; Indemnification ..............................................44
9.11    Compensation and Duties of Plan Administrator .................................44
9.12    Privilege and Immunities ....................................................................44
9.13    Company Action. .................................................................................45
9.14    Standing to Pursue Debtors' Rights, Including Preserved Causes of Action....................................................................................................45
9.15    Certain Tax Considerations..................................................................45

ARTICLE X PROVISIONS GOVERNING DISTRIBUTIONS ....................................49

10.1    Distributions for Allowed Claims ...............................................49
10.2    Interest of Claims ......................................................................49
10.3    Distributions by Plan Administrator as Disbursement Agent ...................49
10.4    Means of Cash Payment.............................................................49
10.5    Fractional Distributions ............................................................50
10.6    De Minimis Distributions ..........................................................50
10.7    Delivery of Distributions; Unclaimed Distributions ................................50
10.8    Withholding, Payment and Reporting Requirements With Respect to Distributions.................................................................................50
10.9    Setoffs ....................................................................................51
10.10    No Distribution in Excess of Allowed Amounts ......................................51
10.11    Allocation of Distributions ........................................................51
10.12    Forfeiture of Distributions .........................................................51

ARTICLE XI PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION OF CLAIMS ....................................................................................52

11.1    Claims Administration Responsibility......................................................52
11.2    Claims Objections.....................................................................52
11.3    Estimation of Contingent or Unliquidated Claims....................................52
11.4    Expungement and Disallowance of Certain Claims ................................52
11.5    Distributions on Account of Disputed Claims ...........................................52
11.6    Amendments to Claims..............................................................52
11.7    Claims Paid and Payable by Third Parties ...............................................53
11.8    Adjustment to Claims Without Objection..................................................53

ARTICLE XII EXECUTORY CONTRACTS ....................................................53

12.1    Executory Contracts Deemed Rejected ...................................................53

ARTICLE XIII CONFIRMATION AND CONSUMMATION OF THIS PLAN ...........53

13.1    Conditions Precedent to the Effective Date ..............................................53
13.2    Effective Date Notice.................................................................54
13.3    Waiver of Conditions Precedent to the Effective Date ...........................54
13.4    Effect of Non-Occurrence of Effective Date ............................................54

ARTICLE XIV EFFECTS OF CONFIRMATION ...........................................54

14.1    Exculpation, Releases, and Injunctions ...............................................54
14.2    Term of Bankruptcy Injunction or Stays ..................................................57

ARTICLE XV RETENTION OF JURISDICTION ...........................................57

15.1    Exclusive Jurisdiction of Bankruptcy Court ............................................57

ARTICLE  XVI MISCELLANEOUS PROVISIONS .......................................................58

16.1    Modification of this Plan ............................................................58
16.2    Revocation, Withdrawal, or Non-Confirmation of this Plan ......................59
16.3    Binding Effect ...........................................................................59
16.4    Subordination Rights ..................................................................59
16.5    Severability of Plan Provisions .....................................................59
16.6    Payment of Statutory Fees; Filing of Quarterly Reports ..........................59
16.7    Exemption from Section 1146 ......................................................60
16.8    Filing of Additional Documents ....................................................60
16.9    Insurance ..................................................................................60
16.10   Cancellation of Existing Securities and Agreements ...............................60
16.11   Successors and Assigns.................................................................60
16.12   Notices .....................................................................................60
16.13   Governing Law ..........................................................................62
16.14   Entire Agreement .......................................................................62
16.15   Exhibits and Schedules ................................................................62
16.16   Computation of Time ..................................................................62
16.17   Reservation of Rights...................................................................62

30926754.12

## DISCLAIMER

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.

SEE ARTICLE V HEREIN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THIS COMBINED DISCLOSURE STATEMENT AND PLAN.

30926754.12

## INTRODUCTION[2]

AeroCision Parent, LLC, and its debtor affiliates, AeroCision, LLC and Numet Machining Techniques, LLC, as debtors and debtors in possession (each, a "**Debtor**", and collectively, the "**Debtors**") jointly propose the following Combined Disclosure Statement and Plan, as it may be amended, supplemented, restated, or modified from time to time (together with the Plan Supplement, this "**Combined Disclosure Statement and Plan**") for the liquidation of the Debtors' remaining Assets and distribution of the proceeds of the Assets to the Holders of Allowed Claims against the Debtors as set forth herein and in accordance with chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended and as in effect on the Confirmation Date or otherwise applicable to the Chapter 11 Cases, the "**Bankruptcy Code**").

Each Debtor is a proponent of this Combined Disclosure Statement and Plan within the meaning of section 1129 of the Bankruptcy Code, and this Combined Disclosure Statement and Plan constitutes a separate plan of liquidation for each Debtor. Holders of Claims and Interests may refer to this Combined Disclosure Statement and Plan for a discussion of, among other things, the Debtors' history, businesses, properties, operations, the Chapter 11 Cases, risk factors, summary and analysis of this Plan, and certain other related matters.

**ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ARE ENCOURAGED TO READ THIS COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND IN THIS PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THIS PLAN, OR ANY PART THEREOF, AT ANY TIME, INCLUDING PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

## ARTICLE I
## DEFINED TERMS AND RULES OF INTERPRETATION

**Defined Terms**

1.1    **"Acquired Assets"** shall have the meaning given to such term in the Asset Purchase Agreement.

1.2    **"Administrative Expense"** shall mean any cost or expense of administration of the Chapter 11 Cases entitled to priority pursuant to sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) professional compensation and reimbursement awarded or allowed pursuant to sections 328, 330, 331 or 503(b) of the Bankruptcy Code to the extent incurred on or after the Petition Date and through the Effective Date, including the Professional Fees; (c) an administrative expense of the type described in section 503(b)(9) of the Bankruptcy Code; and (d) any and all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code.

1.3    **"AeroCision"** shall mean Debtor AeroCision, LLC.

---

[2]    Capitalized terms used but not otherwise defined in this Introduction shall have the meanings ascribed to such terms below.

**1.4** **"AeroCision Assets"** shall mean (a) AeroCision's interest in certain Acquired Assets for which AeroCision holds legal title for the benefit of BG Acquisition, and (b) any other Acquired Assets that are held by AeroCision for the benefit of BG Acquisition during the pendency of the TSA, as set forth in the Sale Documents. For the avoidance of doubt, AeroCision Assets are not Wind Down Assets or property of the Estates within the meaning of Bankruptcy Code section 541, and Wind Down Assets are not AeroCision Assets.

**1.5** **"AeroCision Parent"** shall mean Debtor AeroCision Parent, LLC.

**1.6** **"Affiliate"** shall mean any "affiliate", as such term is defined in section 101(2) of the Bankruptcy Code.

**1.7** **"Allowed"** shall mean, with respect to any Claim or Interest, such Claim or Interest or any portion thereof that the Debtors or the Post-Effective Date Debtors have assented to the validity of or that has been (a) allowed by a Final Order of the Bankruptcy Court, (b) allowed pursuant to the terms of this Combined Disclosure Statement and Plan, (c) allowed by agreement between the Holder of such Claim, on one hand and the Debtors or Post-Effective Date Debtors, as applicable, on the other hand, or (d) allowed by a Final Order of a court in which such Claim could have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

**1.8** **"Article"** shall refer to an article of this Combined Disclosure Statement and Plan.

**1.9** **"Asset Purchase Agreement"** shall mean that certain Asset Purchase Agreement, dated November 12, 2023, as may be amended, supplemented, restated, or modified from time to time by and between BG Acquisition as Purchaser and the Debtors as Sellers.

**1.10** **"Assets"** shall mean any and all right, title, and interest of the Debtors and the Estates in and to property of whatever type or nature, including their books and records and any and all rights and benefits under the Sale Documents; *provided*, that any assets sold in connection with the Sale Transaction or otherwise held for the benefit of BG Acquisition during the pendency of the TSA are not "Assets" as defined herein.

**1.11** "**Assumption Schedule**" shall mean the schedule of Executory Contracts that will be assumed by the Debtors pursuant to this Plan, if any, which shall be included in the Plan Supplement.

**1.12** **"Ballot"** shall mean the ballot form distributed to each Holder of a Claim entitled to vote to accept or reject this Plan for purposes of casting its vote to accept or reject this Plan.

**1.13** **"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the District of Delaware.

**1.14** **"Bankruptcy Rules"** shall mean the Federal Rules of Bankruptcy Procedure, as amended from time to time.

**1.15** **"Bar Date"** shall mean, with respect to any particular Claim, the applicable date established by the Bankruptcy Court by which Proof of Claims must be Filed with respect to such Claims, other than Administrative Expenses.

**1.16** **"Bar Date Motion"** shall mean the *Motion of Debtors for Entry of Order (I) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising Under Section 503(b)(9) of the Bankruptcy Code), (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief* [D.I. 115].

1.17    **"Bar Date Order"** shall mean that certain *Order (I) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising Under Section 503(b)(9) of the Bankruptcy Code), (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief* [D.I. 131].

1.18    **"BG Acquisition"** shall mean BG Acquisition, Inc. shall mean the Purchaser under the Asset Purchase Agreement.

1.19    **"Bid Deadline"** shall mean November 3, 2023 at 5:00 p.m. (prevailing Eastern Time).

1.20    **"Bidding Procedures"** shall have the meaning specified in the Bidding Procedures Order.

1.21    **"Bidding Procedures Motion"** shall mean the *Debtors' Motion for Entry of (A) an Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities and Permitted Encumbrances, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures and Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (III) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, and (IV) Granting Related Relief; and (B) an Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities and Permitted Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 108].

1.22    **"Bidding Procedures Order"** shall mean that certain *Order (I) Approving Bidding Procedures, (II) Scheduling an Auction and a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment and Sale of Contracts and Leases, and (V) Granting Related Relief* [D.I. 137].

1.23    **"Board"** shall have the meaning specified in Section 3.1(b).

1.24    **"Bromford Group"** shall mean non-Debtor Bromford Group Limited.

1.25    **"Bromford Intermediate"** shall mean non-Debtor Bromford Intermediate Holdings, Ltd.

1.26    **"Business Day"** shall mean any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)) on which commercial banks are open for business in New York, New York.

1.27    **"Cash"** shall mean cash and cash equivalents in U.S. dollars.

1.28    **"Cause of Action"** shall mean any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff or counterclaim and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any counterclaim or defense, including fraud, mistake, duress, usury, recoupment, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer or similar claim.

1.29    "**Chapter 11 Case**" shall mean, with respect to a particular Debtor, the case under chapter 11 of the Bankruptcy Code pending for such Debtor in the Bankruptcy Court, jointly administered with each other Debtor's Chapter 11 Case, and the "**Chapter 11 Cases**" shall mean the Debtors' Chapter 11 Cases, collectively.

1.30    "**CIT Loan Agreement**" shall mean that certain Master Loan and Security Agreement, dated as of August 2, 2018, by and among (i) AeroCision and the U.K. Borrower, as borrowers, and (ii) FCB, as lender, and as amended, supplemented, restated, or modified from time to time prior to the Petition Date.

1.31    "**Claim**" shall mean any "claim," as such term is defined in section 101(5) of the Bankruptcy Code, and "**Claim**" shall mean a claim as such term is defined in section 101(5) of the Bankruptcy Code against a Debtor .

1.32    "**Claims Register**" shall mean the official register of Claims maintained by the Notice and Claims Agent.

1.33    "**Claims Objection Deadline**" shall mean one hundred eighty (180) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court; *provided however*, that the Plan Administrator may seek extensions of such date from the Bankruptcy Court at any time.

1.34    "**Class**" shall mean a class of Claims or Interests designated in Article III of this Plan, pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.35    "**Conditional Disclosure Statement Order**" shall mean the order (and all exhibits thereto) entered by the Bankruptcy Court (x) conditionally approving this Combined Disclosure Statement and Plan for solicitation purposes, (y) approving the Solicitation Materials, and (z) allowing solicitation of this Combined Disclosure Statement and Plan to commence (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

1.36    "**Confirmation**" shall mean the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

1.37    "**Confirmation Date**" shall mean the date upon which Confirmation occurs.

1.38    "**Confirmation Hearing**" shall mean the hearing held by the Bankruptcy Court to consider Confirmation, as such hearing may be adjourned or continued from time to time.

1.39    "**Confirmation Order**" shall mean the Bankruptcy Court order approving this Combined Disclosure Statement and Plan on a final basis pursuant to sections 1125 and 1129 of the Bankruptcy Code.

1.40    "**Consummation**" shall mean the occurrence of the Effective Date.

1.41    "**DIP Agent**" shall mean Citizens Bank, N.A., in its capacities as collateral agent and administrative agent under the DIP Credit Agreement.

1.42    "**DIP Claims**" shall mean all Claims against any Debtor arising on account of the DIP Facility.

1.43    "**DIP Credit Agreement**" shall mean that certain Senior Secured Super-Priority Debtor-in- Possession Credit Agreement, by and among AeroCision and Numet, as borrowers, AeroCision Parent, as guarantor, the DIP Agent, and the DIP Lenders, as may be amended, restated, supplemented or otherwise modified from time to time.

**1.44**    **"DIP Facility"** shall mean the debtor-in-possession secured financing facility consisting of a new money term loan facility in an aggregate principal amount of $15,500,000 provided to the Debtors by the DIP Lenders, pursuant to and subject to the terms and conditions of the DIP Credit Agreement and the DIP Orders.

**1.45**    **"DIP Final Order"** shall mean that certain *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506(c), 507 and 552, (I) Granting Expedited Relief, (II) Approving Postpetition Financing, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Authorizing Use of Cash Collateral, (V) Granting Adequate Protection, (VI) Modifying Automatic Stay, and (VII) Granting Related Relief* [D.I. 81], as amended by that certain *Order (I) Authorizing and Approving Amendment No. 2 to the DIP Credit Agreement and (II) Amending the Final DIP Order on Account of Such Amendment* [D.I. 158], as amended by that certain *Order (I) Authorizing and Approving Amendment No. 2 to the DIP Credit Agreement and (II) Amending the Final DIP Order on Account of Such Amendment* [D.I. 158].

**1.46**    **"DIP Lenders"** shall mean Ally Bank, Citizens Bank, N.A., Channel Funding, LLC and Siemens Financial Services, Inc., in their respective capacities as such.

**1.47**    **"DIP Motion"** shall have the meaning specified in Section 3.3(b).

**1.48**    **"Disclosure Statement"** shall mean the disclosure statement, as amended, supplemented, or modified from time to time, that is embodied within this Combined Disclosure Statement and Plan and distributed in accordance with, among others, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

**1.49**    **"Disputed"** shall mean, as to any Claim (or portion thereof) or Interest against a Debtor, a Claim or Interest to the extent the allowance of such Claim or Interest has not been Allowed and is the subject of (i) a timely objection or request for estimation in accordance with this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Confirmation Order, and which objection, request for estimation or dispute has not been withdrawn, with prejudice, or determined by an order of the Bankruptcy Court, or (ii) a dispute that is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law.

**1.50**    **"Distribution"** shall mean a delivery of Cash by the Plan Administrator to the Holders of Allowed Claims pursuant to this Plan.

**1.51**    **"Distribution Date"** shall mean the date on which a Distribution is made pursuant to this Plan.

**1.52**    **"Effective Date"** shall mean the date on which this Plan shall take effect, which date shall be a Business Day on or after the Confirmation Date on which all conditions precedent to the effectiveness of this Plan specified in Section 13.1, have been satisfied, or, if capable of being waived, waived in accordance with Section 13.3, which date shall be specified in a notice filed with the Bankruptcy Court by the Post- Effective Date Debtors or the Plan Administrator.

**1.53**    **"Effective Date Notice"** shall mean the notice of the Effective Date delivered in accordance with Article 13.2.

**1.54**    **"Entity"** shall mean any "entity," as such term is defined in section 101(15) of the Bankruptcy Code.

**1.55**    **"Estate"** shall mean, with respect to a particular Debtor, the estate created for such Debtor upon commencement of its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code, and the "Estates" shall mean every Debtors' Estate, collectively.

1.56    **"Excluded Actions"** shall mean any Causes of Action that:  (a) were sold to the Purchaser under the Asset Purchase Agreement; or (b) are released by the Debtors or the Post-Effective Date Debtors pursuant to this Plan, including as set forth in Article XIV.  For the avoidance of doubt, any and all Claim(s) that the Debtors have against LHCP Fund I and/or LHCP GP are not Excluded Actions and are Preserved Causes of Action.

1.57    **"Exculpated Parties"** shall mean, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Post-Effective Date Debtors; (c) the Debtors' directors and officers, and any other person serving as a fiduciary of the Debtors' Estates, in each case, who served at any time between the Petition Date and the Effective Date of this Plan; and (d) all financial advisors, attorneys, accountants, investment bankers and other professionals retained by the Debtors in these Chapter 11 Cases.

1.58    "**Executory Contract**" shall mean a contract to which one or more of the Debtors is party, other than an Unexpired Lease, which contract is subject to assumption or rejection in accordance with section 365 of the Bankruptcy Code.

1.59     **"FCB"** shall mean First-Citizens Bank & Trust Company.

1.60    **"File," "Filed,"** or **"Filing"** shall mean file, filed, or filing with the Bankruptcy Court (including clerk thereof) in the Chapter 11 Cases or, with respect to the filing of a Proof of Claim, the Notice and Claims Agent.

1.61    **"Final Order"** shall mean, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, seek certiorari, or move for a new trial, re-argument, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing has been timely filed, or (b) any appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, petitioned, or moved.

1.62     **"First Day Declaration"** shall mean the *Declaration of David Nolletti in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 2].

1.63    **"First Lien Agent"** shall mean Citizens Bank, N.A., in its capacity as administrative agent for the First Lien Lenders.

1.64    **"First Lien Claims"** shall mean all Claims arising under the First Lien Credit Agreement.

1.65    **"First Lien Credit Agreement"** shall mean that certain First Lien Credit Agreement, dated November 5, 2019, by and among (i) AeroCision, Numet, and the U.K. Borrower, as borrowers, (ii) the First Lien Guarantors, as guarantors, (iii) the First Lien Agent, and (iv) the First Lien Lenders, and as amended, supplemented, restated, or modified from time to time prior to the Petition Date.

1.66    **"First Lien Forbearance Agreement"** shall mean that certain Forbearance and Amendment Agreement, dated May 31, 2022, by and among AeroCision, Numet, the U.K. Borrower, the First Lien Guarantors, the First Lien Agent, and the First Lien Lenders, and as amended, supplemented, restated, or modified from time to time prior to the Petition Date.

1.67    **"First Lien Guarantors"** shall mean Bromford Intermediate, the U.K. Parent, AeroCision Parent, Bromford Group, and each subsidiary of AeroCision Parent that executed a guaranty agreement.

**1.68**    **"First Lien Lenders"** shall mean the financial institutions party from time to time to the First Lien Credit Agreement, as lender or revolving issuing bank, in their respective capacities as such.

**1.69**    **"General Bar Date**" shall mean 5:00 p.m. (prevailing Eastern Time) on November 6, 2023, as established by the Bar Date Order.

**1.70**    **"General Administrative Expense"** shall mean any Administrative Expense other than Professional Fees.

**1.71**    **"General Unsecured Claims"** shall mean any Claim against any of the Debtors that is not: (a) a Claim for an Administrative Expense; (b) a DIP Claim; (c) a Priority Tax Claim; (d) a Claim for Professional Fees; (e) a Priority Non-Tax Claim; (f) a Superpriority Lien Claim; (g) a First Lien Claim; (h) an Other Secured Claim, or (i) an Intercompany Claim.

**1.72**    **"Governmental Unit"** shall mean any "governmental unit," as such term is defined in section 101(27) of the Bankruptcy Code.

**1.73**    **"Holder"** shall mean an Entity holding a Claim against or Interest in the Debtor as of the applicable date of determination.

**1.74**    **"Impaired"** shall mean, with respect to a Claim, Interest or Class of Claims or Interests, that it is "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

**1.75**    **"Impaired Class"** shall mean a Class of Claims or Interests that is Impaired.

**1.76**    **"Insurance Refund"** shall mean approximately $280,000 in insurance policy premium refunds which, upon receipt by the Debtors, shall be used for the Wind Down Budget in accordance with that certain *Side Letter Agreement*, dated November 19, 2023, (the "**Side Letter**") by and among the Debtors and the Senior Agent.

**1.77**    **"Intercompany Claim"** shall mean any Claim held by a Debtor against another Debtor.

**1.78**    **"Intercreditor Agreement"** shall mean that certain Amended and Restated Intercreditor Agreement, dated as of May 12, 2021, by and among the Superpriority Lien Agent, for itself and on behalf of the other Prepetition Agents and Prepetition Secured Creditors.

**1.79**    **"Interest"** shall mean any "equity security" (as such term is defined in section 101(16) of the Bankruptcy Code) or other equity interest in a Debtor, including any share of common or preferred stock, membership interest, partnership unit, or other evidence of ownership of, or a similar interest in, a Debtor, and any option, warrant, or right, contractual or otherwise, to purchase, sell, subscribe, or acquire any such equity security or other equity interest in a Debtor, whether or not transferable, issued or unissued, authorized, or outstanding.

**1.80**    "**IRC**" shall mean the Internal Revenue Code of 1986, as amended.

**1.81**    **"IRS"** shall mean the Internal Revenue Service.

**1.82**    **"Litigation Proceeds"** shall mean the net Cash proceeds of the Preserved Causes of Action.

**1.83**    **"LHCP Fund I"** shall mean Liberty Hall Capital Partners Fund I, L.P.

**1.84**    **"LHCP GP"** shall mean Liberty Hall Capital Partners Fund I GP, LLC.

1.85    **"Lien"** shall mean a "lien" as such term is defined in section 101(37) of the Bankruptcy Code.

1.86    **"Local Rules"** shall mean the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

1.87    **"May 2022 Forbearance"** shall mean, collectively, the execution of the First Lien Forbearance Agreement, the Second Lien Forbearance Agreement, and the Superpriority Lien Forbearance Agreement.

1.88    **"MUFG"** shall mean MUFG Union Bank, N.A.

1.89    **"New Membership Interests"** shall mean one (1) unit of the membership interests of Reorganized AeroCision Parent, to be issued as of the Effective Date and held by the Plan Administrator. The unit of New Membership Interests issued pursuant to the Plan will be deemed upon such issuance, validly issued, fully paid and non-assessable, and shall be uncertificated and non-transferable, except by operation of law.

1.90    **"Notice and Claims Agent"** shall mean Epiq Corporate Restructuring, LLC, in its capacity as notice, claims and solicitation agent for the Debtors and any successor agent.

1.91    **"Numet"** shall mean Debtor Numet Machining Techniques, LLC.

1.92    **"Numet Assets"** shall mean (a) Numet's interest in certain Acquired Assets for which Numet holds legal title for the benefit of BG Acquisition, and (b) any other Acquired Assets that are held by Numet for the benefit of BG Acquisition during the pendency of the TSA, as set forth in the Sale Documents.  For the avoidance of doubt, Numet Assets are not Wind Down Assets or property of the Estates within the meaning of Bankruptcy Code section 541, and Wind Down Assets are not Numet Assets.

1.93    **"Objection***"*** shall mean any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Expense).

1.94    "**OCP Order**" shall mean that certain *Order Authorizing the Debtors to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business* [D.I. 203].

1.95    **"Other Priority Claim"** shall mean any Claim, other than an Administrative Expense or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

1.96    **"Other Secured Claim"** shall mean any Secured Claim other than a DIP Claim, Superpriority Lien Claim, First Lien Claim, or Second Lien Claim.

1.97     **"Paid in Full," "Payment in Full," or "Pay in Full"** shall mean, with respect to an Allowed Claim, payment in Cash or other consideration in an aggregate amount equal to the Allowed amount thereof.

1.98    **"Person"** shall mean "Person" as defined in section 101(41) of the Bankruptcy Code.

1.99    **"Petition Date"** shall mean July 31, 2023, the date on which the Debtors commenced the Chapter 11 Cases in the Bankruptcy Court.

1.100    **"Plan"** shall mean this joint chapter 11 plan of liquidation embodied in this Combined Disclosure Statement and Plan, as it may be altered, amended, modified or supplemented from time to time including

in accordance with any documents submitted in support hereof and the Bankruptcy Code or the Bankruptcy Rules.

**1.101** **"Plan Administrator"** shall mean a Person or Entity selected by the First Lien Agent, with the consent of the Debtors (which consent shall not be unreasonably withheld, conditioned, or delayed), who shall conduct the Wind Down and provide the services to the Post-Effective Date Debtors as set forth in the Plan Administration Agreement.

**1.102** **"Plan Administration Agreement"** shall mean the agreement setting forth, among other things, the identity, terms of compensation, and authority of the Plan Administrator and the scope of services to be provided by the Plan Administrator, which shall be included in the Plan Supplement.

**1.103** **"Plan Administration Expenses"** shall mean the reasonable and documented fees, expenses, and costs incurred by the Post-Effective Date Debtors or the Plan Administrator in connection with carrying out the obligations under this Plan, including the maintenance or disposition of the Wind Down Assets (including, but not limited to, Plan Administrator fees, attorneys' fees, the fees of professionals and other Persons retained by the Plan Administrator, personnel-related expenses and any Taxes imposed on the Wind Down Assets), and any other expenses incurred in accordance with the Plan Administration Agreement.

**1.104** **"Plan Supplement"** shall mean the compilation of documents (or forms thereof), schedules, and exhibits to this Plan, as each may be amended, supplemented, or modified from time to time in accordance with this Plan, the Bankruptcy Code, and Bankruptcy Rules, to be filed with the Bankruptcy Court in accordance with Article X.A.1, including, as applicable: (i) the Wind Down Organizational Documents; (ii) the Plan Administration Agreement; (iii) the Preserved Causes of Action; and (iv) the Assumption Schedule.  For the avoidance of doubt, the Debtors shall have the right to amend, supplement, or modify the Plan Supplement through the Effective Date in accordance with this Plan, the Bankruptcy Code, and the Bankruptcy Rules.

**1.105** **"Post-Effective Date Debtors"** shall mean, collectively, all Debtors and successors thereto after the Effective Date.

**1.106** **"Prepetition Agents"** shall mean, collectively, the First Lien Agent, the Second Lien Agent, and the Superpriority Lien Agent.

**1.107** **"Prepetition Collateral"** shall have the meaning specified in Section 3.1(c)(vi).

**1.108** **"Prepetition First Lien Credit Documents"** shall have the same meaning as set forth in the DIP Final Order.

**1.109** **"Prepetition Second Lien Credit Documents"** shall have the same meaning as set forth in the DIP Final Order.

**1.110** **"Prepetition Secured Creditors"** shall mean, collectively, the First Lien Agent, the First Lien Lenders, the Second Lien Agent, the Second Lien Lenders, the Superpriority Lien Agent, the Superpriority Lien Lenders, and any other "Secured Parties" under the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Superpriority Lien Credit Agreement, as applicable.

**1.111** **"Prepetition Superpriority Lien Credit Documents"** shall have the same meaning as set forth in the DIP Final Order.

**1.112** **"Prepetition Credit Documents"** shall mean, collectively, the Prepetition First Lien Credit Documents, the Prepetition Second Lien Credit Documents, and the Prepetition Superpriority Lien Credit Documents.

**1.113** **"Preserved Causes of Action"** shall mean any and all Causes of Action that are not Excluded Actions.

**1.114** **"Priority Non-Tax Claim"** shall mean any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Expense, DIP Claim, or Priority Tax Claim.

**1.115** **"Priority Tax Claim"** shall mean any Claim of a Governmental Unit entitled to priority pursuant to section 502(i) or 507(a)(8) of the Bankruptcy Code

**1.116** **"Pro Rata"** shall mean the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in such Class and other Classes (or sub-Classes, as the case may be) entitled to share in the same recovery as such Allowed Claim under this Plan.

**1.117** **"Professional"** shall mean any Entity that is, by Bankruptcy Court order: (a) employed for legal, financial advisory, accounting, or other professional services during the Chapter 11 Cases pursuant to section 327 or 1103 of the Bankruptcy Code and to be compensated and reimbursed therefor in accordance with sections 327, 328, 329, 330, 331, and/or 1103 of the Bankruptcy Code; or (b) allowed compensation and reimbursement pursuant to section 503(b)(4) of the Bankruptcy Code; *provided, however*, that "Professional" shall not include any professional-service Entity that the Debtors are authorized to employ, compensate, and reimburse under the OCP Order.

**1.118** **"Professional Fees"** shall mean the accrued, contingent, and/or unpaid compensation for services rendered (including hourly, transaction, and success fees), and reimbursement for expenses incurred, by Professionals, that: (a) notwithstanding the foregoing, shall not exceed the aggregate amounts under the DIP Facility budget (the "**DIP Budget**") and the Wind Down Budget; (b) are awardable and allowable pursuant to sections 327, 328, 329, 330, 331, 503(b)(4), and/or 1103 of the Bankruptcy Code or otherwise rendered allowable prior to the Effective Date; (c) have not been denied by the Bankruptcy Court by Final Order; (d) have not been previously paid (regardless of whether a fee application has been filed for any such amount); and (e) remain outstanding after applying any retainer that has been provided to such Professional. To the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by Final Order of the Bankruptcy Court or any other court of competent jurisdiction, such amount shall no longer constitute Professional Fees.

**1.119** **"Professional Fee Amount"** shall mean the aggregate amount of Professional Fees and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors, prior to and as of the Effective Date and as provided for in the DIP Budget and Wind Down Budget.

**1.120** **"Professional Fee Deadline"** shall mean the deadline for filing final fee applications seeking payment of Professional Fees, which shall be no later than forty-five (45) days after the Effective Date.

**1.121** **"Professional Fee Escrow Account"** shall mean an account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

**1.122** **"Proof of Claim"** shall mean a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases in a manner consistent with this Plan.

**1.123** **"Reinstatement"** or **"Reinstated"** shall mean, with respect to a Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

**1.124** **"Related Party"** shall mean, with respect to an Entity, collectively, its direct and indirect affiliates, and its and its respective affiliates' current and former equity holders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, financial advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective equity holders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, financial advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, trusts, their beneficiaries, and spouses, and other representatives, each in their capacity as such).

**1.125** **"Released Parties"** shall mean, collectively, in each case, solely in their respective capacities as such: (a) the Debtors; (b) the DIP Agent and DIP Lenders; (c) the Superpriority Lien Agent and the Superpriority Lien Lenders; (d) the First Lien Agent and the First Lien Lenders, solely to the extent such parties vote to accept this Plan; (e) the Second Lien Agent and the Second Lien Lenders, solely to the extent such parties vote to accept this Plan; (f) all Holders of Claims that: (1) vote to accept this Plan, or (2) are entitled to vote on this Plan and either abstain from voting or vote to reject this Plan but, in each case, opt into the releases provided for under this Plan; and (g) with respect to each of the Entities described in subsections (a) through (f), such Entity's Related Parties; *provided, however*, that Rowan G.P. Taylor and Michael Warren shall solely be released in their capacity members of the Board; *provided, further*, that notwithstanding any provision of this Combined Disclosure Statement and Plan to the contrary, (i) LHCP Fund I and LHCP GP, and their non-Debtor respective affiliates and their Related Parties shall not be Released Parties and shall not be released under this Plan; and (ii) any party that objects to Confirmation of this Plan (by filing an objection with the Court or appearing at the Confirmation Hearing and making an objection on the record), files a motion to stay the effectiveness of the Confirmation Order, or files an appeal of the Confirmation Order shall not be a Released Party and shall not be released under this Plan.

**1.126** **"Releasing Parties"** shall mean, collectively, in each case solely in their respective capacities as such: (a) the Debtors; (b) the DIP Agent and DIP Lenders; (c) the Superpriority Lien Agent and the Superpriority Lien Lenders; (d) the First Lien Agent and the First Lien Lenders, solely to the extent such parties vote to accept this Plan; (e) the Second Lien Agent and the Second Lien Lenders, solely to the extent such parties vote to accept this Plan; (f) each Holder of a Claim that votes in favor of this Plan or that is entitled to vote on this Plan and either abstains from voting or votes to reject this Plan but, in each case, opts into the releases provided for under this Plan; and (g) each Related Party of each Entity in clauses (a) through (f) for which such Entity is legally entitled to bind such Related Party to the releases contained in this Plan under applicable law; *provided, however*, that, if any of the foregoing entities is excluded as a Released Party due to application of the *proviso* in the definition of "Released Party," such entity also shall not be a Releasing Party in that capacity.

**1.127** **"Reorganized AeroCision"** shall mean AeroCision on and after the Effective Date.

**1.128** **"Reorganized AeroCision Parent"** shall mean AeroCision Parent on and after the Effective Date.

**1.129** **"Reorganized Numet"** shall mean Numet on and after the Effective Date.

**1.130** **"Revolving Credit Facility"** shall have the meaning specified in Section 3.1(c)(iii).

**1.131** **"RSA"** shall mean that certain Restructuring Support Agreement, dated as of July 30, 2023, by and among, inter alia, the Debtors, LHCP Fund I, and the Prepetition Agents.

**1.132** **"Sale"** shall have the meaning specified in Section 3.3(f).

**1.133** **"Sale Hearing"** shall have the meaning specified in the Sale Order.

**1.134** **"Sale Order"** shall mean that certain *Order (A) Approving Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities and Permitted Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 231].

**1.135** **"Sale Proceeds"** shall mean the Cash proceeds of the Sale Transaction.

**1.136** **"Sale Process"** shall have the meaning specified in Section 3.3(f).

**1.137** **"Sale Transaction"** shall have the same meaning as set forth in the Sale Order.

**1.138** **"Sale Documents"** shall have the same meaning as set forth in the Sale Order.

**1.139** **"Schedules"** shall mean the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

**1.140** **"Second Lien Agent"** shall mean Stellus Capital Investment Corporation, in its capacity as administrative agent for the Second Lien Lenders.

**1.141** **"Second Lien Claim"** shall mean all Claims arising under the Second Lien Credit Agreement, which, for the avoidance of doubt, are General Unsecured Claims under this Plan.

**1.142** **"Second Lien Credit Agreement"** shall mean that certain Second Lien Credit Agreement, dated November 5, 2019, by and among (i) AeroCision. Numet, and the U.K. Borrower, as borrowers, (ii) the Second Lien Guarantors, as guarantors, (iii) the Second Lien Agent, and (iv) the Second Lien Lenders, and as amended, supplemented, restated, or modified from time to time prior to the Petition Date. **"Second Lien Forbearance Agreement"** shall mean that certain Forbearance and Amendment Agreement, dated May 31, 2022, by and among AeroCision, Numet, the U.K. Borrower, the Second Lien Guarantors, the Second Lien Agent, and the Second Lien Lenders, and as amended, supplemented, restated, or modified from time to time prior to the Petition Date.

**1.143** **"Second Lien Guarantors"** shall mean Bromford Intermediate, the U.K. Parent, AeroCision Parent, Bromford Group, and each subsidiary of AeroCision Parent that executed a guaranty agreement.

**1.144** **"Second Lien Lenders"** shall mean the financial institutions party from time to time to the Second Lien Credit Agreement, as lender or revolving issuing bank, in their respective capacities as such.

**1.145** **"Secured Claim"** shall mean any Claim that is secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

**1.146   "Securities Act"** shall mean the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder.

**1.147   "Senior Agent"** shall mean Citizens Bank, N.A., in its capacity as the DIP Agent, Superpriority Lien Agent, and First Lien Agent.

**1.148   "Side Letter"** shall have the meaning specified in Section 1.76.

**1.149   "Solicitation Materials"** shall mean the solicitation materials with respect to this Combined Plan and Disclosure Statement, including the Disclosure Statement conditionally approved by the Bankruptcy Court, form of Ballots, and any other solicitation materials, including the solicitation version of this Plan.

**1.150   "Special Committee"** shall have the meaning specified in Section 3.3(e).

**1.151   "Stalking Horse Agreement"** shall mean the Asset Purchase Agreement by and among AeroCision Parent and the Stalking Horse Bidder as more fully described in the *Notice of Filing of Revised Stalking Horse Purchase Agreement* [D.I. 132].

**1.152   "Stalking Horse Bid"** shall mean that bid submitted pursuant to the Stalking Horse Agreement.

**1.153   "Stalking Horse Bidder"** shall mean Citizens Bank, N.A., as administrative agent and sole lead arranger and sole bookrunner in connection with the Senior Priority Loan Documents (as defined in the Stalking Horse Agreement) in its capacity as such under the Stalking Horse Agreement.

**1.154   "Superpriority Lien Agent"** shall mean Citizens Bank, N.A., in its capacity as administrative agent for the Superpriority Lien Lenders.

**1.155   "Superpriority Lien Claim"** shall mean all Claims arising under the Superpriority Lien Credit Agreement.

**1.156   "Superpriority Lien Credit Agreement"** shall mean that certain Superpriority Lien Credit Agreement, dated May 12, 2021, by and among (i) AeroCision and Numet, as borrowers, (ii) the Superpriority Lien Guarantors, as guarantors, (iii) the Superpriority Lien Agent, and (iv) the Superpriority Lien Lenders, and as amended, supplemented, restated, or modified from time to time prior to the Petition Date.

**1.157   "Superpriority Lien Forbearance Agreement"** shall mean that certain Forbearance and Amendment Agreement, dated May 31, 2022, by and among AeroCision, Numet, the Superpriority Lien Guarantors, the Superpriority Lien Agent, and the Superpriority Lien Lenders, and as amended, supplemented, restated, or modified from time to time prior to the Petition Date.

**1.158   "Superpriority Lien Guarantors"** shall mean Bromford Intermediate, the U.K. Parent, AeroCision Parent, Bromford Group, and each subsidiary of AeroCision Parent that executed a guaranty agreement.

**1.159   "Superpriority Lien Lenders"** shall mean the financial institutions party from time to time to the Superpriority Lien Credit Agreement, as lender or revolving issuing bank, in their respective capacities as such.

**1.160   "Taxes"** shall mean all income, gross receipts, sales, use, transfer, payroll, employment, franchise, profits, property, excise, or other similar taxes, estimated import duties, fees, stamp taxes, and duties, value

added taxes, assessments, or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax, or amounts imposed by any taxing authority of a Governmental Unit with respect thereto.

**1.161** **"TSA"** shall mean that certain Transition Services Agreement, dated as of November 21, 2023, by and among BG Acquisition and the Debtors.

**1.162** **"U.S. Trustee"** shall mean the Office of the United States Trustee for the District of Delaware.

**1.163** **"U.K. Borrower"** shall mean non-Debtor Bromford Industries Limited.

**1.164** **"U.K. Debtors"** shall mean, together, the U.K. Borrower and Accrofab Limited.

**1.165** **"U.K. Entities"** shall mean the Debtors' Affiliates, based in the United Kingdom, including Bromford Intermediate Holdco (UK) Limited, Bromford Acquisitions Limited, Bromford Holdings Limited, Bromford Investments Limited, the U.K. Parent, Bromford Group, the U.K. Borrower.

**1.166** **"U.K. Parent"** shall mean non-Debtor Bromford Midco Limited.

**1.167** **"Unexpired Lease"** shall mean a lease to which one or more of the Debtors is party, which lease is subject to assumption or rejection in accordance with section 365 of the Bankruptcy Code.

**1.168** **"Unimpaired**" shall mean, with respect to a Class, Claim, Interest, or a Holder of a Claim or Interest, that such Class, Claim, Interest, or Holder is not Impaired.

**1.169** **"Unsecured Claim"** shall mean any Claim that is not a Secured Claim.

**1.170** **"Voting Classes"** shall mean Class 3 and Class 4.

**1.171** **"Voting Deadline"** shall mean **the earlier of (i) February 2, 2024 and (ii) twenty-eight (28) days following service of the Solicitation Materials at 4:00 p.m. (prevailing Eastern Time)**, the date and time by which Ballots to accept or reject this Plan must be received to be tabulated, as set forth by the Conditional Disclosure Statement Order.

**1.172** **"Voting Record Date"** shall mean **December 13, 2023**.

**1.173** **"Voting Report"** shall mean the report certifying the methodology for the tabulation of votes and result of voting on this Plan.

**1.174** **"Wind Down"** shall mean the process to (x) wind down, dissolve, and liquidate the Debtors' Estates, including, among other things, pursuing the Preserved Causes of Action, and (y) distribute any resulting or Assets in accordance with this Plan.

**1.175** **"Wind Down Assets"** shall mean all property of the Debtors' Estates not transferred pursuant to the Asset Purchase Agreement and the Sale Documents or distributed to Holders of Allowed Claims on the Effective Date, including, without limitation, (i) the Insurance Refund and/or the Withheld Proceeds, provided that once the Debtors receive the Insurance Refund they shall remit to the Senior Agent such amount as is necessary to reconcile the Withheld Proceeds in accordance with the Side Letter; (ii) the Preserved Causes of Action; (iii) any proceeds realized or received from such Assets; (iv) all rights of setoff, recoupment, and other defenses against Claims; (v) all rights under the Sale Documents; (vi) all bank accounts (as set forth in the Plan Administration Agreement); and (vii) all documents, communications,

and information protected by the attorney-client privilege, the work-product privilege, and any other applicable evidentiary privileges.

**1.176 "Wind Down Budget"** shall mean the agreed upon budget for the Wind Down, which shall be in form and substance acceptable to the Debtors, with the consent of Senior Agent (which consent shall not be unreasonably withheld, conditioned, or delayed).

**1.177 "Wind Down Organizational Documents"** shall mean the form of the certificates or articles of incorporation, bylaws, or such other applicable formation or governance documents of the Post-Effective Date Debtors, including the Plan Administration Agreement, which shall be included in the Plan Supplement and shall be in form and substance acceptable to the Plan Administrator, with the consent of the Prepetition Agents (in their sole discretion) and the consent of the Debtors (which consent shall not be unreasonably withheld, conditioned, or delayed)

**1.178 "Wind Down Reversionary Assets"** shall mean any Assets that remain after the Plan Administrator has implemented and completed the Wind Down, including the payment or reserving of fees incurred and unpaid in connection with the Wind Down, and any remaining funds held in the Professional Fee Escrow Account after all Professional Fees have been irrevocably paid in full pursuant to one or more Final Orders.

**1.179 "Withheld Proceeds"** shall mean the $280,000 withheld from the Sale Transaction to fund the Wind Down Budget until the Debtors' or Post-Effective Date Debtors' receipt of the Insurance Refund. For the avoidance of doubt, upon receipt of the Insurance Refund, the Debtors shall remit the Withheld Proceeds to the Senior Agent in accordance with the Side Letter.

**Rules of Interpretation**

**1.180** For purposes of this Plan and unless otherwise specified herein: (1) each term, whether stated in the singular or the plural, shall include, in the appropriate context, both the singular and the plural; (2) each pronoun stated in the masculine, feminine, or neuter gender shall include, in the appropriate context, the masculine, feminine, and the neuter gender; (3) the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (4) all references to articles or Articles are references to the Articles hereof; (5) all captions and headings are inserted for convenience of reference only and are not intended to be a part of, or to affect the interpretation of, this Plan; (6) any reference to the Debtors or the Post-Effective Date Debtors shall mean, in the appropriate context, both the Debtors and the Post-Effective Date Debtors; (7) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (8) any reference to an existing document, schedule, or exhibit, whether or not filed, having been filed, or to be filed, shall mean that document, schedule or exhibit, as it may thereafter be amended, modified, or supplemented; (9) any reference to an event occurring on a specified date, including on the Effective Date, shall mean that the event will occur on that date or as soon thereafter as reasonably practicable; (10) any reference to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (11) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time and as applicable to the Chapter 11 Cases; (12) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with, the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (13) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (14) any term used in capitalized form herein that is not otherwise defined but that is used in the

Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

# ARTICLE  II
## CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**2.1**    **Classification of Claims and Interests**. The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including related to the claims reconciliation process. Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in this Combined Disclosure Statement and Plan, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

Claims and Interests, except for Administrative Expenses, DIP Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest, as applicable, in that Class. To the extent a specified Class does not include any Allowed Claims or Allowed Interests, as applicable, then such Class shall be deemed not to exist.

This Plan constitutes a separate chapter 11 plan of liquidation for each Debtor. Pursuant to section 1122, the classification of Claims and Interests is as follows:

| Class/ Designation | Plan Treatment | Estimated Amount of Total Claims | Status | Projected Recovery |
|---|---|---|---|---|
| **Class 1**: Priority Non- Tax Claims | In full and final satisfaction, compromise, settlement, and release of and in exchange for such Claim, on, or as soon as reasonably practicable following the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | $0 | **Unimpaired** <u>Not</u> Entitled to Vote (Presumed to Accept) | 100% |
| **Class 2**: Other Secured Claims | In full and final satisfaction, compromise, settlement, and release of and in exchange for such Claim, on, or as soon as reasonably practicable following the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the Debtors' or Post-Effective Date Debtors' option: (a) Cash equal to the amount of such Allowed Other | $0 | **Unimpaired** <u>Not</u> Entitled to Vote (Presumed to Accept) | 100% |

| Class/ Designation | Plan Treatment | Estimated Amount of Total Claims | Status | Projected Recovery |
|---|---|---|---|---|
| | Secured Claim; or (b) such other treatment as agreed to in writing by the Holder of such Allowed Other Secured Claim and the Debtors, Post-Effective Date Debtors, or the Plan Administrator, as applicable. | | | |
| **Class 3:** First Lien Claims | In full and final satisfaction, settlement, discharge and release thereof, and in exchange therefor, each Holder of an Allowed First Lien Claim shall receive, from time to time following the Effective Date, ninety percent (90%) of their *pro rata* share of: (a) any available Litigation Proceeds from Preserved Causes of Action, and (b) any available Wind Down Reversionary Assets. | $105,906,013.75 | **Impaired** <u>Entitled</u> to Vote | [●]% |
| **Class 4:** General Unsecured Claims | In full and final satisfaction, settlement, discharge, and release thereof, and in exchange therefor, each Holder of a General Unsecured Claim, which, for the avoidance of doubt, includes Holders of Second Lien Claims, shall receive, from time to time following the Effective Date, ten percent (10%) of: (a) any available Litigation Proceeds from Preserved Causes of Action, and (b) any available Wind Down Reversionary Assets, to be distributed *pro rata*; <u>provided</u>, <u>however,</u> that the aggregate recovery to all Holders of General Unsecured Claims in Class 4 shall not exceed $500,000. | $31,837,592 | **Impaired** <u>Entitled</u> to Vote | [●]% |
| **Class 5**: Intercompany Claims | On the Effective Date, all Intercompany Claims shall be cancelled, released, and extinguished without Distribution, and will be of no further force or effect. | N/A | **Impaired** <u>Not</u> Entitled to Vote (Deemed to Reject) | N/A |
| **Class 6a:** Interests in AeroCision Parent | On the Effective Date, all Interests in AeroCision Parent shall be cancelled as of the Effective Date, and Holders thereof shall receive no Distribution on account of such Interests. | N/A | **Impaired** <u>Not</u> Entitled to Vote (Deemed to Reject) | N/A |

| Class/ Designation | Plan Treatment | Estimated Amount of Total Claims | Status | Projected Recovery |
|---|---|---|---|---|
| **Class 6b:** Interests in AeroCision | On the Effective Date, all Interests in AeroCision shall be reinstated and vest in Reorganized AeroCision Parent solely for corporate governance purposes, and the Holders thereof shall receive no Distribution on account of such Interests. | N/A | **Impaired** <u>Not</u> Entitled to Vote (Deemed to Reject) | N/A |
| **Class 6c:** Interests in Numet | On the Effective Date, all Interests in Numet shall be reinstated and vest in Reorganized AeroCision Parent solely for corporate governance purposes, and the Holders thereof shall receive no Distribution on account of such Interests. | N/A | **Impaired** <u>Not</u> Entitled to Vote (Deemed to Reject) | N/A |

# ARTICLE III
## BACKGROUND AND DISCLOSURES

**3.1   General Background[3]**

*(a)   The Debtors' History and Business Operations*

The Debtors are part of an organization known as Bromford Group ("**Bromford**"), a global manufacturing business in the aerospace, defense, and power generation industry that was founded in the United Kingdom in 1973. Bromford supplies turbine engine and related components to all major OEM's (*i.e.,* original equipment manufacturers), including many of the industry's most prominent manufacturers, like General Electric Aviation, Pratt & Whitney, and Rolls-Royce Group PLC, among others. The manufacturers use Bromford's components to manufacture engines for aircraft and other vehicles.

Bromford is a key supplier to many commercial, military, and business jet platforms. Bromford also delivers highly critical and sensitive aerospace components directly to the United States Department of Defense and has a breadth of coverage across most military engine programs. Bromford also serves customers in the overhaul and repair market for both military and commercial aviation and ground power applications.

In 2016, Bromford was acquired by a newly-formed company formed on behalf of Liberty Hall Capital Partners Fund I, L.P., a private equity fund located in Charleston, South Carolina. Over the next few years, Bromford expanded from three sites in the United Kingdom to seven[4] sites across the United Kingdom, United States, and India through several acquisitions, including the acquisition of the Debtors. Debtor AeroCision, LLC was acquired in 2018 and Debtor Numet Machining Techniques, LLC was acquired in 2019. AeroCision and Numet were each initially founded in 1984 and are both Delaware limited

---

[3]   Additional information regarding the Debtors' business, assets, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in detail in the First Day Declaration.

[4]   Upon the consolidation of the Debtors' Birmingham and Leicester sites, the number of sites declined to six during 2022.

liability companies. The other Debtor, AeroCision Parent, was formed in 2018 in connection with the acquisition of AeroCision and is also a Delaware limited liability company.

Together, Debtors AeroCision and Numet comprise the U.S. Machining division of Bromford's business and support the sectors described above, including, among others, engineering, production, shipping, human resources, finance, and quality control. AeroCision Parent is a holding company with no operations.

On November 16, 2023, the Court entered the Sale Order and thereby authorized the Sale of AeroCision and Numet's businesses to BG Acquisition, as discussed more fully below.  The Sale closed on November 21, 2023.

(b)    *Corporate History and Organizational Structure as of the Petition Date*

Debtor AeroCision Parent wholly owns AeroCision and Numet and is wholly-owned by Bromford Intermediate, a Cayman Islands entity.

Bromford Intermediate's ultimate parent is Bromford Holdings, L.P., a Cayman Islands entity, that is controlled by LHCP GP and is approximately 51% owned by LHCP Fund I, with other investors and certain current and former members of management owning the remaining equity interests.

Each Debtor has historically been managed by its respective managing member, and the overall Bromford enterprise is managed by LHCP GP. However, on July 5, 2023, the limited liability company agreement of AeroCision Parent was amended to provide that AeroCision Parent would be managed by a board of managers consisting of five managers (the "**Board**").  On July 6, 2023, two independent managers (the "**Independent Directors**"), Jill Frizzley and Eric Salzman, were appointed to the Board and tasked with overseeing the restructuring process.  As more fully described below, a Special Committee comprised of the Independent Directors was formed in September 2023 to oversee all aspects of the Debtors' restructuring efforts.

(c)    *Prepetition Indebtedness*

(i)    *Generally*

As of the Petition Date, the Debtors were parties to the following pre-petition loan and security agreements:

(a)    the CIT Loan Agreement;

(b)    the First Lien Credit Agreement;

(c)    the Superpriority Lien Credit Agreement; and

(d)    the Second Lien Credit Agreement.

The chart below sets forth the Debtors' funded debt obligations as of the Petition Date and as of the date hereof, and each loan agreement is described in greater detail below:

| Debt Obligation and Order of Priority | Approximate Amount of Debtor Obligations Outstanding as of the Petition Date | Approximate Amount of Debtor Obligations Outstanding Post-Sale Closing |
|---|---|---|
| Superpriority Lien Term Loans | $3,740,625, plus interest, fees, costs, and expenses | $0 |
| First Lien Term Loans and Revolving Credit Facility | $97,224,000, plus interest, fees, costs, and expenses | $105,906,013.75 |
| Second Lien Term Loans | $26,250,000, plus interest, fees, costs, and expenses | $31,434,415 |
| CIT Loan | $1,974,280 in principal and interest | $0 |

(ii)    *CIT Loan Agreement*

On August 2, 2018, AeroCision and the U.K. Borrower entered into the CIT Loan Agreement with FCB as lender in connection with their lease of various manufacturing equipment used at their various facilities. On August 6, 2018, in connection with the CIT Loan Agreement, CIT Bank, N.A. filed a UCC Financing Statement with the Delaware Department of State evidencing its lien on the collateral as fully described and set forth therein.

On February 1, 2023, FCB, as successor by merger to CIT Bank N.A., issued a default notice to AeroCision and the U.K. Borrower, asserting various defaults, including (i) the borrowers' failure to make required payments under those certain Equipment Notes, dated May 3, 2019, August 2, 2019, and December 2019, respectively, and (ii) a default under one or more of the borrowers' minimum liquidity covenants under other outstanding, owing or committed indebtedness in an aggregate amount greater than $1,000,000. As a result of the defaults asserted by FCB, FCB demanded immediate payment of the amounts owed under such Equipment Notes and elected to forbear on a "day-by-day" basis from exercising its default-related rights and remedies under the related Security Agreement.

As of the Petition Date, approximately $1,974,280 in principal and interest was outstanding under the CIT Loan. Pursuant to the Sale Order, BG Acquisition assumed AeroCision's obligations under the CITT Loan Agreement. Accordingly, as of the date hereof, no amounts are owed by the Debtors under the CIT Loan Agreement.

(iii)    *First Lien Term Loan*

On November 5, 2019, the Debtors and certain of their non-Debtor affiliates entered into the First Lien Credit Agreement and the Second Lien Credit Agreement in connection with the acquisition of Numet. The First Lien Credit Agreement provided for two term loans, the U.K. term loans to the U.K. Borrower in an initial aggregate principal amount of $31,520,000 and the U.S. term loans to AeroCision and Numet in the aggregate principal amount of $47,280,000. The First Lien Credit Agreement also provided for a revolving credit facility (the "**Revolving Credit Facility**") in the initial aggregate principal amount of $20,000,000. The obligations under the First Lien Credit Agreement are guaranteed in full by the First Lien Guarantors, subject to certain exceptions as set forth in the First Lien Credit Agreement.

Following the occurrence of certain events of default under the First Lien Credit Agreement, including (i) the failure to maintain the required minimum liquidity amount and (ii) cross-defaults under the Second Lien Credit Agreement and the Superpriority Lien Credit Agreement due to the failure to comply with the minimum liquidity covenant, the parties to the First Lien Credit Agreement entered into the First

Lien Forbearance Agreement. Pursuant to the First Lien Forbearance Agreement, the First Lien Lenders agreed to forbear from exercising their remedies under the First Lien Credit Agreement until the earliest of August 29, 2022 and the occurrence of certain specified events. On August 30, 2022, the First Lien Lenders issued a notice of default under the First Lien Credit Agreement.

As of the Petition Date, approximately $97,224,000 in principal, plus interest, fees, costs, and expenses was outstanding under the First Lien Credit Agreement (including under the Revolving Credit Facility), of which approximately $54,058,916 was owed by the Debtors. The balance was owed by the Debtors' foreign affiliates, but was guaranteed by the Debtors.

Following the closing of the Sale and the application of the Sale Proceeds to the obligations under the First Lien Credit Agreement, the balance owed under the First Lien Credit Agreement is approximately $$105,906,013.75 as of the date hereof.

### (iv)    *Second Lien Term Loan*

On November 5, 2019, the Debtors and certain of their non-Debtor affiliates entered into the Second Lien Credit Agreement. The Second Lien Credit Agreement provided for two terms loans, the U.K. term loans to the U.K. Borrower in an initial aggregate principal amount of $10,000,000 and the U.S. term loans to the AeroCision and Numet in the aggregate principal amount of $15,000,000. The obligations under the Second Lien Credit Agreement are guaranteed by the Second Lien Guarantors.

Following the occurrence of certain events of default under the Second Lien Credit Agreement, including the failure to maintain the required minimum liquidity amount, the parties to the Second Lien Credit Agreement entered into the Second Lien Forbearance Agreement. Pursuant to the Second Lien Forbearance Agreement, the Second Lien Lenders agreed to forbear from exercising their remedies under the Second Lien Credit Agreement until the earliest of August 29, 2022 and the occurrence of certain specified events. On August 30, 2022, the Second Lien Lenders issued a notice of default under the Second Lien Credit Agreement.

As of the Petition Date, approximately $26,250,000 in principal, plus interest, fees, costs, and expenses was outstanding under the Second Lien Credit Agreement, of which approximately $19,307,473 is owed by the Debtors. The balance is owed by the Debtors' foreign affiliates, but was guaranteed by the Debtors.

### (v)    *Superpriority Lien Credit Agreement*

On May 12, 2021, Debtors AeroCision and Numet entered into the Superpriority Lien Credit Agreement, pursuant to which the Superpriority Lien Lenders agreed to extend credit in the form of term loans in an initial aggregate principal amount of $3,750,000. The obligations under the Superpriority Lien Credit Agreement were guaranteed by the Superpriority Lien Guarantors.

Following the occurrence of certain events of default under the Superpriority Lien Credit Agreement, including (i) the failure to maintain the required minimum liquidity amount and (ii) cross- defaults under the First Lien Credit Agreement and the Second Lien Credit Agreement due to the failure to maintain the required minimum liquidity, the parties to the Superpriority Lien Credit Agreement entered into the Superpriority Lien Forbearance Agreement. Pursuant to the Superpriority Lien Forbearance Agreement, the Superpriority Lien Lenders agreed to forbear from exercising their remedies under the Superpriority Lien Credit Agreement until the earliest of August 29, 2022 and the occurrence of certain specified events. On August 30, 2022, the Superpriority Lien Lenders issued a notice of default under the Superpriority Lien Credit Agreement.

As of the Petition Date, approximately $3,740,625 in principal, plus interest, fees, costs, and expenses fees was outstanding under the Superpriority Lien Credit Agreement. Following the closing of the Sale, the Sale Proceeds were applied to the outstanding balance under the Superpriority Lien Credit Agreement and no obligations remain thereunder.

*(vi)    Amended and Restated Intercreditor Agreement*

As more fully set forth in the Prepetition Credit Documents, the Debtors granted security interests in and liens on substantially all personal property of the Debtors (collectively, the "**Prepetition Collateral**"), to the Prepetition Agents to secure repayment of the obligations owing to the Prepetition Secured Creditors. Pursuant to the Intercreditor Agreement, the Prepetition Agents agreed, among other things and as more specifically set forth therein, on the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Creditors with respect to the Prepetition Collateral. Specifically, the Prepetition Agents agreed that the Superpriority Lien Lenders held a first priority lien on the Debtors' assets, the First Lien Lenders held a second priority lien on the Debtors' assets, and the Second Lien Lenders held a third priority lien on the Debtors' assets, among other things.

*(vii)    Factoring Agreements*

Pursuant to an agreement with Citibank Europe PLC, AeroCision granted Citibank Europe PLC a security interest in all accounts receivable and the proceeds thereof owing to AeroCision from Rolls-Royce. This arrangement was favorable to AeroCision for several reasons, including predictability in cash flow. The factoring agreement allowed for AeroCision to sell Citibank Europe PLC its accounts receivable from Rolls-Royce Group PLC in exchange for immediate payment net of Citibank Europe PLC's fee, and Citibank Europe PLC thereafter assumed responsibility for collection on the accounts receivable directly from Rolls-Royce Group PLC.

Numet had a similar factoring agreement with MUFG. Pursuant to Numet's Agreement with MUFG, Numet granted MUFG a security interest in all accounts receivable and the proceeds thereof owing to Numet from General Electric Company. This arrangement, like the Rolls-Royce Group PLC arrangement between Citibank Europe PLC and AeroCision, was advantageous to Numet for purposes of cash flow predictability. Numet sold MUFG the accounts receivable due from General Electric Company in exchange for immediate payment, net of MUFG's fee, and MUFG thereafter collected on the accounts receivable from General Electric Company.

Numet was also party to a factoring agreement with Citibank N.A. and Citibank Europe PLC, dated July 24, 2014, pursuant to which it granted Citibank N.A. a security interest in its accounts receivable owing from Pratt & Whitney pursuant to a similar structure and for the same reasons as described above.

*(viii)    Other Unsecured Debt*

As of the Petition Date, the Debtors' books and records listed approximately $13,500,000 in non- contingent, undisputed, liquidated unsecured debt to vendors, taxing authorities, insurers, employees, and other contract counterparties. As of the date hereof, the Debtors estimate that approximate $448,177 of that amount is currently outstanding.

**3.2**    **Events Leading to Chapter 11**

*(a)*    ***The COVID-19 Pandemic and the U.K. Administration Proceedings***

Since early 2020, the COVID-19 pandemic has devastated the aerospace industry, including the Debtors and their non-Debtor affiliates in the United Kingdom.  Travel restrictions were implemented early in the pandemic and grounded most of the global commercial airline fleet, causing customer demand for parts and services to decrease rapidly.  In 2020, over two-thirds of the world's passenger fleet was grounded during the year due to closed borders and concerns that flying was unsafe.

While facing a dramatic decrease in demand, the Company was also forced to incur dramatically higher costs to manufacture its products due to significant disruptions in the global supply chain and critical labor shortages.  Global supply chain disruptions caused by the COVID-19 pandemic resulted in increased lead times to procure raw material, driving longer manufacturing production cycles and inhibiting the Company's ability to make and sell its products.  To overcome these challenges, the Company incurred additional costs for expedited freight and increased labor costs to turn products quickly, maintain delivery schedules and manage customer requirements.

Global price inflation for the raw materials required to manufacture aerospace parts also caused the Company's inventory costs to increase substantially and reduced liquidity. Many of the Company's customer contracts were negotiated at a time with low inflation and, accordingly, included long-term, fixed price terms without inflation protection provisions. Thus, despite the Company's increased manufacturing costs, it was not able to pass those costs along to customers.

During 2022, the U.K. Debtors (*i.e.*, the Debtors' two operating United Kingdom affiliates) struggled to continue operations due to, *inter alia*, many of the above issues. In December 2022, the U.K. Debtors approached their two key customers and sought financial support to allow them to continue operations. On or about February 24, 2023, those negotiations formally failed and, on February 27, 2023, the U.K. Debtors filed a notice of intention to appoint administrators.[5]

On March 9, 2023, Ryan Grant and Chris Pole of Interpath Advisory were appointed as joint administrators of the U.K. Debtors.  The U.K. administration remains ongoing.  Nothing in this Combined Disclosure Statement and Plan, the Plan Supplement, or the Confirmation Order is intended to affect or impair the existing obligations, if any, of the U.K. Entities to the the First Lien Lenders, which obligations and claims are intended to remain obligations of, and claims against the U.K. Entities.

*(b)*    ***Additional Circumstances Leading to the Commencement of the Chapter 11 Cases***

In 2022 and 2023, the Debtors suffered from the effects of the COVID-19 pandemic, which were compounded by (i) the Debtors' efforts to address the U.K. Debtors' liquidity issues prior to the administration proceeding, including both by assisting with the U.K. Debtors' customer negotiations and by providing over $20,000,000 in funds to the U.K. Debtors since 2020, including cash transfers and the payment of shared corporate expenses, and (ii) changes in inspection protocols imposed by a major customer that prevented Numet from shipping a significant number of its products for approximately a 9 to 12 month period. This reduction in sales resulted in losses of approximately $5,000,000 to $7,000,000.

As a solution to the Debtors' liquidity and capital structure challenges, the Debtors initially explored the potential acquisition of another aerospace manufacturing business combined with the full

---

[5]    The Debtors are affiliated with various other non-operating United Kingdom entities that are not part of the U.K. administration proceedings.

refinancing of the Debtors' capital structure. Had the transaction been consummated, it would have reset the Debtors' capital structure through the refinancing, including a material deleveraging and liquidity infusion. The Debtors entered into a letter of intent to acquire this business in November 2021 and retained Jefferies LLC ("**Jefferies**") shortly thereafter as their investment banker to help raise the capital necessary to finance the transaction.

As part of its financing process, Jefferies contacted 103 investors, including senior debt and junior capital providers, and received 10 indications of interest ("**IOIs**") by January 28, 2022. After receiving the IOIs, the Debtors and Jefferies worked with a number of investors to advance diligence and obtain a binding financing commitment. However, due to a variety of factors, including significant volatility in the capital markets, the Debtors were unable to secure a financing commitment. The Debtors and Jefferies negotiated the May 2022 Forbearance with the Debtors' secured creditors to obtain additional time to secure a financing commitment and to continue to engage with investors during the forbearance period. However, by the expiry of the May 2022 Forbearance on August 29, 2022, the Debtors were unsuccessful in obtaining an actionable financing solution.

Without an actionable financing proposal, the Debtors began discussing a consensual restructuring transaction with their majority equity holder, LHCP Fund I, and the Prepetition Secured Creditors to de-leverage the Debtors' balance sheet. In connection therewith, the Debtors retained Young Conaway Stargatt & Taylor, LLP as their restructuring counsel on or about April 28, 2023. After discussing various options, the parties determined that the best path for addressing the Debtors' liquidity issues was an expeditious plan of reorganization that would minimize any disruption to operations and any impact on the Debtors' essential vendor and customer relationships.

*(c)*     ***The Restructuring Support Agreement***

In the months leading up to the Petition Date, the Debtors and their advisors engaged extensively with LHCP Fund I and the Prepetition Secured Creditors, among other sponsor entities (collectively, with LHCP Fund I and the Prepetition Secured Creditors, the "**Consenting RSA Parties**") to consensually restructure the loans under the Superpriority Credit Agreement, the First Lien Credit Agreement, and the Second Lien Credit Agreement.

After months of good faith and arm's length negotiations, each of the Debtors and the Consenting RSA Parties entered into the RSA, pursuant to which the Debtors and the Consenting RSA Parties agreed, subject to the terms and conditions set forth therein, to *inter alia*, support, vote to accept (to the extent applicable), and to implement a restructuring through the Chapter 11 Cases and the Prepackaged Plan (as defined below).

## 3.3     The Chapter 11 Cases

*(a)*     ***Generally***

On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The commencement of a chapter 11 case creates an estate that is composed of all of the legal and equitable interests of the debtor as of that date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." By order entered on July 31, 2023, the Chapter 11 Cases are being jointly administered for procedural purposes only. No committee, trustee, or examiner has been appointed in the Chapter 11 Cases.

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors. With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay will remain in effect from the Petition Date until the Effective Date of this Plan.

*(b)*     ***The Prepackaged Plan and "First Day" Pleadings***

The Debtors commenced the Chapter 11 Cases to effectuate a comprehensive restructuring of their secured debt obligations in accordance with the RSA, through the *Joint Prepackaged Chapter 11 Plan of Reorganization of AeroCision Parent, LLC and Its Affiliated Debtors and Debtors in Possession* [D.I. 14] (the "**Prepackaged Plan**"), filed on the Petition Date. The RSA was appended as Exhibit E to the *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Reorganization of AeroCision Parent, LLC and its Affiliated Debtors and Debtors in Possession* [D.I. 15] (the "**Prepackaged Disclosure Statement**").

The Debtors also filed the following "first-day" motions and applications seeking relief designed to ease the Debtors' transition into chapter 11, maximize the value of the Assets, and minimize the effects of the commencement of the Chapter 11 Cases:

i.     *Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases* [D.I. 3] ("**Joint Administration Motion**").

ii.    *Debtors' Application for Entry of an Order Appointing Epiq Corporate Restructurings, LLC as Claims and Noticing Agent Effective as of the Petition Date* [D.I. 4] ("**Claims Agent Retention Application**").

iii.   *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (A) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Utility Services, (B) Deeming Utility Companies Adequately Assured of Future Payment, (C) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (D) Setting a Final Hearing Related Thereto* [D.I. 5] ("**Utilities Motion**").

iv.    *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363, and 364 of the Bankruptcy Code, (A) Authorizing Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Programs, Including Payment of Policy Premiums and Broker Fees, (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (C) Scheduling a Final Hearing* [D.I. 6] ("**Insurance Motion**").

v.     *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Continue Factoring Their Receivables Under the Factoring Agreements with Their Prepetition Practices* [D.I. 7] ("**Factoring Motion**").

vi.    *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(8), 541, 1107(a), and 1008 of the Bankruptcy Code, (A) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (C) Scheduling a Final Hearing* [D.I. 8] ("**Taxes Motion**").

vii.   *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363, 503(b), 1107(a), and 1108 of the Bankruptcy Code, Bankruptcy Rule 2015, and Local Rule*

30926754.12

26

*2015-2, (A) Authorizing and Approving Continued Use of Cash Management System, (B) Authorizing Use of Prepetition Bank Accounts and Business Forms, (C) Authorizing Performance of Intercompany Transactions in the Ordinary Course of Business and Granting Administrative Expense Status for Postpetition Intercompany Claims; and (D) Granting Certain Related Relief* [D.I. 9] ("**Cash Management Motion**").

viii.    *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of the Bankruptcy Code, (A) Authorizing (I) Payment of Accrued Prepetition Employee Wages, Salaries, and Other Compensation; (II) Payment of Prepetition Employee Business Expenses; (III) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (IV) Payment of Workers' Compensation Obligations; (V) Payments for Which Prepetition Payroll Deductions Were Made; (VI) Payment of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (VII) Payment to Third Parties of All Amounts Incident to the Foregoing Payments and Contributions; and (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto* [D.I. 10] ("**Wages Motion**").

ix.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors, and (II) Granting Related Relief* [D.I. 11] ("**Critical Vendors Motion**").

x.    *Debtors' Motion for Entry of Interim and Final Orders (I) Granting Expedited Relief, (II) Approving Postpetition Financing, (III) Granting Liens and Providing Superpriority Administrative Expenses Status, (IV) Authorizing Use of Cash Collateral, (V) Granting Adequate Protection, (VI) Modifying Automatic Stay, and (VII) Granting Related Relief* [D.I. 12] ("**DIP Motion**").

The Bankruptcy Court entered an order approving the relief requested in the Joint Administration Motion [D.I. 37] on a final basis on the Petition Date.  On August 1, 2023, the Bankruptcy Court entered orders (i) approving the Claims Agent Retention Application [D.I. 39] on a final basis, and (ii) approving the relief requested in the Utilities Motion [D.I. 41], the Insurance Motion [D.I. 42], the Factoring Motion [D.I. 43], the Taxes Motion [D.I. 44], the Cash Management Motion [D.I. 45], the Wages Motion [D.I. 46], the Critical Vendors Motion [D.I. 47], and the DIP Motion [D.I. 48] on an interim basis.

On August 17, 2023, the Bankruptcy Court entered orders approving, on a final basis, the relief requested in the Utilities Motion [D.I. 74], the Insurance Motion [D.I. 75], the Factoring Motion [D.I. 78], the Taxes Motion [D.I. 76], the Cash Management Motion [D.I. 77], the Wages Motion [D.I. 79], the Critical Vendors Motion [D.I. 80], and the DIP Motion [D.I. 81].

*(c)*    ***Retention of Professional Advisors***

Pursuant to orders entered on August 29, 2023, the Bankruptcy Court authorized the Debtors to retain and employ (i) Young Conaway Stargatt & Taylor, LLP as bankruptcy counsel [D.I. 93]; (ii) Jefferies LLC as investment banker [D.I. 94]; (iii) Epiq Corporate Restructuring, LLC, as administrative advisor [D.I. 95]; and (iv) Riveron Management Services, LLC to provide David Nolletti as the Debtors' Chief Restructuring Officer ("**CRO**"), Hayley Hutchison as the Debtors' Chief Financial Officer ("**CFO**"), and additional support staff [D.I. 96].  The Bankruptcy Court also entered the OCP Order, thereby authorizing the Debtors to retain and employ certain professionals utilized by the Debtors in the ordinary course of business prior to the Petition Date [D.I. 203].

*(d)*      ***Schedules and Bar Dates***

On October 3, 2023, the Debtors filed the Schedules.  Among other things, the Schedules set forth the Claims of known or putative creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records as of the Petition Date.

On September 27, 2023, the Bankruptcy Court entered the Bar Date Order, granting the relief requested in the Bar Date Motion.  The Bar Date Order established the General Bar Date as November 6, 2023 at 5:00 p.m. (prevailing Eastern Time).

*(e)*      ***The Termination of the RSA***

After the Prepackaged Plan was filed, certain unexpected events prompted the Senior Agent to allege that the Debtors' majority equity holder, LHCP Fund I, breached the RSA.  LHCP Fund I disputes that it breached the RSA.  On September 1, 2023, the DIP Lenders advised the Debtors that certain alleged defaults existed under the DIP Credit Agreement, including, among others, the alleged breach of the RSA.[6] As a result of these events, the Debtors, with the consent of the Prepetition Secured Creditors, determined to implement an alternative disposition process to ensure the continued operation of the Debtors' businesses as going concerns regardless of the outcome of the Prepackaged Plan.

To that end, the Board agreed to the appointment of a Special Committee comprised of the Independent Directors (the "**Special Committee**"), tasked with overseeing all aspects of the Debtors' reorganization, including commencing a sale process under section 363 of the Bankruptcy Code and continuing to negotiate and explore the Prepackaged Plan process, in addition to other alternative plan processes.  The Special Committee directed Jefferies to immediately prepare for and commence a marketing and sale process.

On November 6, 2023, Citizens Bank, N.A., in its capacity as Senior Agent, filed an adversary proceeding against LHCP Fund I asserting breaches of the RSA.  *See Citizens Bank, N.A., as Administrative Agent v. Liberty Hall Capital Partners Fund I, L.P.*, Case No. 23-11032, Adv. Pro. 23-50755 (KBO) (Bankr. D. Del. Nov. 6, 2023).

*(f)*      ***The Debtors' Sale Process***

At the direction of the Special Committee, the Debtors commenced the sale of substantially all of their Assets to maximize the value of the Estates for the benefit of the Debtors' creditor constituencies and other stakeholders (the "**Sale**").  On September 13, 2023, the Debtors filed the Bidding Procedures Motion, seeking authority to proceed with the sale process, the purpose of which was to generate maximum value for their Assets (the "**Sale Process**").  To facilitate the Sale Process, the Debtors, in consultation with Jefferies, and their other professional advisors, proposed the Bidding Procedures to preserve flexibility in the Sale Process, generate the greatest level of interest in the Debtors' Assets, and result in the highest or otherwise best value for those Assets.

As set forth in the Bidding Procedures Motion, the Debtors, in consultation with Jefferies and their professional advisors, worked extensively to implement a robust and expeditious Sale Process.  On October 2, 2023, the Bankruptcy Court entered the Bidding Procedures Order, approving the Bidding Procedures and establishing, among other things, October 23, 2023 as the bid deadline and scheduling an auction (the

---

[6]      The Debtors reserve all rights regarding whether there was a default under the DIP Credit Agreement.  Nothing herein shall be construed as an admission of a default under the DIP Credit Agreement or a waiver of the Debtors' rights to contest the DIP Lenders' contentions.

"**Auction**") and the Sale Hearing.  With the consent of the Senior Agent, the Bid Deadline was subsequently extended to November 3, 2023, and the Auction and Sale Hearing were subsequently adjourned to November 7, 2023 and November 8, 2023, respectively.  *See* D.I. 167.

The Bidding Procedures Order also authorized the Debtors to enter into the Stalking Horse Agreement.  The Debtors and Jefferies viewed the Stalking Horse Bid as a critical component of an efficient Sale Process because the Stalking Horse Bid, among other things, (a) allowed the Debtors to negotiate a fully integrated contract that contained terms and conditions likely to be acceptable to other potential buyers; (b) provided a template setting forth the deliverables required by an actual buyer in a form acceptable to the Debtors; and (c) provided certainty that a sale would close. Notably, the Stalking Horse Bidder did not require any bid protections or expense reimbursements in connection with the Stalking Horse Agreement.

In connection with the Sale Process, the Debtors, with the assistance of Jefferies, contacted approximately seventy-six (76) strategic and financial potential buyers. Of these parties, forty-two (42) entered into non-disclosure agreements with the Debtors and were given access to a virtual data room.  The Debtors, with the assistance of Jefferies, worked extensively with these parties as they engaged in due diligence with respect to the Assets and in preparation for the Bid Deadline and the Auction.

Prior to the Bid Deadline, the Debtors received three (3) bids, in addition to the Stalking Horse Bid. Ultimately, only one of the three (3) competing Bids satisfied the requirements established by the Bidding Procedures Order to render such bid a "qualified bid", within the meaning of the Bidding Procedures.  In advance of the Auction, the Debtors, with the assistance of Jefferies, engaged both the Stalking Horse Bidder and the other qualified bidder – Cadence-Southwick, Inc. ("**Cadence**") – in an effort to assign an appropriate value proposition to both bids and determine the baseline bid which would be announced at the outset of the Auction.

In accordance with the Bidding Procedures Order, the Debtors commenced the Auction via Zoom on November 7 and 8, 2023.  Upon commencing the Auction, the Debtors, in consultation with the Senior Agent, identified the qualified bid submitted by Cadence as the baseline bid.  The Stalking Horse Bidder elected not to submit a competing offer for the subject Assets during the Auction.

At the conclusion of the Auction, the Debtors, in consultation with the Senior Agent, identified (i) the final bid submitted by Cadence, with a cash purchase price of $40.2 million for substantially all of the Debtors' Assets plus the assumption of certain liabilities, as set forth in the Asset Purchase Agreement, as the successful bid, and (ii) the final bid submitted by Stalking Horse Bidder, with a cash purchase price of $40.0 million for substantially all of the Debtors' Assets plus the assumption of certain liabilities, as more fully set forth in the Stalking Horse Agreement, as the next-highest bid.

On November 8, 2023, after the Auction concluded, the Bankruptcy Court held the Sale Hearing wherein counsel to the Debtors explained the economic terms of the Sale Transaction.  The Bankruptcy Court entered the Sale Order on November 16, 2023, thereby approving the Sale Documents and the sale to Cadence's designee, BG Acquisition.  The Sale Transaction closed on November 21, 2023 and, in connection with the closing, all amounts owed by the Debtors to the DIP Lenders in respect of the DIP Facility and to the Superpriority Lien Lenders under the Superpriority Lien Credit Agreement were satisfied in Cash in full from the proceeds of the Sale Transaction.  After the applicability of Sale Proceeds, the balance owed under the First Lien Credit Agreement is $105,906,013.75 as of the date hereof.

*(g)*      ***The Wind-Down of the Estates***

Since the Sale Transaction closed, the Debtors have focused on transitioning their businesses to BG Acquisition, including completing the novation process for the assignment of government contracts in accordance with the TSA, and winding down their remaining affairs. This Combined Plan and Disclosure Statement provides for the continuation of that process and for the administration and distribution of the Wind Down Assets, including distributions to Holders of Allowed Claims in accordance with the terms of this Plan and the treatment of Allowed Claims described more fully herein. The Plan Administrator will effectuate such liquidation and Distributions.

Pursuant to this Combined Disclosure Statement and Plan, and to comply with the Debtors' obligations under the TSA, Interests in AeroCision and Interests in Numet will vest in Reorganized AeroCision Parent. The Plan Administrator shall be the sole stockholder of Reorganized AeroCision Parent. Each of Reorganized AeroCision and Reorganized Numet will continue to operate to satisfy the obligations of the Debtors under the Sale Documents.

Upon termination of the TSA, the Plan Administrator will (i) liquidate, wind down, and dissolve each of Reorganized AeroCision and Reorganized Numet under applicable law; (ii) request that each of AeroCision's and Numet's Chapter 11 Cases be closed; and (iii) file each of AeroCision's and Numet's final tax returns.

After the termination of the TSA, the Plan Administrator will (i) liquidate, wind down, and dissolve Reorganized AeroCision Parent under applicable law; and (ii) file AeroCision Parent's final tax returns.

## ARTICLE IV
## CONFIRMATION AND VOTING PROCEDURES

**4.1**      **Confirmation Procedure**. The Conditional Disclosure Statement Order, among other things, conditionally approves this Combined Disclosure Statement and Plan for solicitation purposes only and authorizes the Debtors to solicit votes to accept or reject this Plan. The Confirmation Hearing has been scheduled for February 13, 2024 at 9:30 a.m. (prevailing Eastern Time) at the Bankruptcy Court, 824 North Market Street, 6th Floor, Courtroom 3, Wilmington, Delaware 19801 to consider (a) final approval of this Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

**4.2**      **Procedure for Objections**. Any objection to final approval of this Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code or confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code must be made in writing, filed with the Bankruptcy Court, and served on (i) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor (mnestor@ycst.com), Andrew L. Magaziner (amagaziner@ycst.com), Elizabeth S. Justison (ejustison@ycst.com), and Shella Borovinskaya (sborovinskaya@ycst.com); (ii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware, 19801, Attn: Jane M. Leamy (jane.m.leamy@usdoj.gov); (iii) counsel to the DIP Lenders and Senior Agent, (a) Choate, Hall & Stewart LLP, Two International Place, Boston, Massachusetts 02110, Attn: Douglas R. Gooding, P.C. (dgooding@choate.com) and Jonathan D. Marshall (jmarshall@choate.com) and (b) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801, Attn: Derek C. Abbot (dabbott@morrisnichols.com) in each case by no later than February 5, 2023 at 4:00 p.m. (prevailing

Eastern Time).  Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

**4.3      Requirements for Confirmation**. The Bankruptcy Court will confirm this Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code.  Among other requirements, this Plan (i) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, this Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (ii) must be feasible.  The Bankruptcy Court must also find, among other things, that this Plan: (i) has classified Claims and Interests in a permissible manner; (ii) complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (iii) has been proposed in good faith.

**4.4      Classification of Claims and Interests**

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, this Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims that, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be and have not been classified).  The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest in a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest.  The Debtors believe that this Plan complies with such standard.  If the Bankruptcy Court finds otherwise, however, it could deny confirmation of this Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under this Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that this Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for this Plan to be confirmed.  If such a situation develops, the Debtors intend, in accordance with the terms of this Plan, to make such permissible modifications to this Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of this Plan.

**EXCEPT AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY AND ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE- SOLICITATION, ACCEPTANCE OF THIS PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THIS PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim, and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under this Plan to Holders of Allowed Claims reflects an appropriate resolution of their Claims, taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm this Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on this Plan, or do not vote to accept this Plan, but who will be bound by the provisions of this Plan if it is confirmed by the Bankruptcy Court.

**4.5     Impaired Claims or Interests**

Pursuant to the provisions of the Bankruptcy Code, only certain classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

**Under this Plan, Holders of Claims in Classes 3 and 4 are Impaired and are <u>entitled to vote on the Plan</u>.** Under this Plan, Holders of Claims or Interests in Classes 5, 6(a), 6(b), and 6(c) are Impaired and will not receive or retain any property under this Plan on account of such Claims or Interests and, therefore, are not entitled to vote on this Plan and deemed to reject this Plan. Under this Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on this Plan and are presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THIS PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN <u>CLASS 3 AND 4</u>.**

**4.6     Confirmation Without Necessary Acceptances; Cramdown**

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims entitled to vote on the plan, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable" with respect to each non-accepting impaired class of claims or interests. Here, because Holders of Claims and Interests in Classes 5, 6(a), 6(b), and 6(c) are deemed to reject this Plan, the Debtors will seek confirmation of this Plan by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtors believe that, under this Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  Accordingly, the Debtors believe that this Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable."  To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors and equity holders, as follows:

*(a)*     *Secured Creditors*. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

*(b)*     *Unsecured Creditors*. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

*(c)*     *Interests*. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan.

The Debtors believe that this Plan is "fair and equitable" as to the non-accepting Impaired Classes because no Holder of a Claim or Interest junior to those in Classes 5, 6(a), 6(b), and 6(c) is entitled to receive any property under this Plan.

**4.7**     **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the plan).  Inasmuch as the Assets have been, or will be, liquidated and this Plan provides for the Distribution of all of the net Cash proceeds of the Assets to Holders of Claims that are Allowed in accordance with this Plan, for purposes of this test, the Debtors have analyzed the ability of the Plan Administrator to meet its obligations under this Plan.  Based on the Debtors' analysis, the Plan Administrator will have sufficient resources to accomplish its tasks under this Plan. Therefore, the Debtors believe that the liquidation pursuant to this Plan will meet the feasibility requirements of the Bankruptcy Code.

**4.8     Best Interests Test and Liquidation Analysis**

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.  If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

Because this Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by this Plan.  However, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case, as set forth in the Liquidation Analysis attached hereto as **Exhibit A**.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee.  The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing this Plan and winding up the affairs of the Debtors.  Conversion also would likely delay the liquidation process. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for professionals) that are Allowed in the chapter 7 cases.

Accordingly, the Debtors believe that Holders of Allowed Claims would receive an amount equal to or less than anticipated under this Plan if the Chapter 11 Cases were converted to chapter 7 cases, and, therefore, the classification and treatment of Claims and Interests in this Plan complies with section 1129(a)(7) of the Bankruptcy Code.

**4.9     Acceptance of this Plan**

The rules and procedures governing eligibility to vote on this Plan, solicitation of votes, and submission of Ballots are set forth in the Conditional Disclosure Statement Order.

For this Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept this Plan.  At least one Class entitled to vote to accept or reject this Plan, excluding the votes of insiders, must actually vote to accept this Plan.

**IF YOU ARE ENTITLED TO VOTE ON THIS PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE.  PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THIS PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS PLAN OR PROCEDURES FOR VOTING ON THIS PLAN, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT (I) BY TELEPHONE AT: (888) 375-1501 (TOLL-FREE) OR (503) 966-2671 (INTERNATIONAL) OR (II) BY EMAIL AT: AeroCision@epiqglobal.com.  THE NOTICE AND CLAIMS AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

**This Plan contains a Release by Holders of Claims.  If you vote to accept this Plan by the Voting Deadline, you will be deemed to have granted the Release by Holders of Claims.  If you vote to reject this Plan, you will not be deemed to have granted the Release by Holders of Claims unless you opt in to the Release by Holders of Claims by the Voting Deadline.**

## ARTICLE V
## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THIS PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW.  HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THIS PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THIS PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THIS PLAN AND ITS IMPLEMENTATION.

**5.1     This Plan May Not Be Accepted**

The Debtors can make no assurances that the requisite acceptances to this Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in this Plan.

**5.2     This Plan May Not Be Confirmed**

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm this Plan.  Even if the Bankruptcy Court determined that this Combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm this Plan if it finds that any of the statutory requirements for confirmation had not been met.  Moreover, there can be no assurance that modifications to this Combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes.  If this Plan is not confirmed, it is unclear what Distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of liquidation.

If this Plan is not confirmed, this Plan will need to be revised, and it is unclear whether a chapter 11 reorganization or liquidation of the Debtors' Assets could be implemented and what distribution the

Holders of Allowed Claims would receive.  If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining Assets in chapter 7, in which case it is likely that the Holders of Allowed Claims would receive less favorable treatment than they would receive under this Plan. There can be no assurance that the terms of any such alternative would be similar to or as favorable to the Debtors' creditors as those proposed in this Plan.

**5.3     Distributions to Holders of Allowed Claims Under this Plan May Be Inconsistent with Projections**

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution.  There can be no assurance that the estimated Claim amounts set forth in this Plan are correct.  These estimated amounts are based on certain assumptions with respect to a variety of factors.  Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

**5.4     Objections to Classification of Claims**

Section 1122 of the Bankruptcy Code requires a plan to classify claims and interests.  The Bankruptcy Code also provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtors believe that all Claims and Interests have been appropriately classified in this Plan.  To the extent that the Bankruptcy Court finds that a different classification is required for this Plan to be confirmed, the Debtors would seek to (i) modify this Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims in connection with solicitation of this Plan for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under this Plan, by changing the composition of such Class and the vote required for approval of this Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve this Plan based upon such reclassification. Except to the extent that modification of classification in this Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of this Plan by any Holder of Claims in connection with solicitation will constitute a consent to this Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against this Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that this Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that this Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that this Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of this Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of this Plan and could increase the risk that this Plan will not be consummated.

30926754.12

**5.5    Failure to Consummate this Plan**

This Plan provides for certain conditions that must be satisfied (or waived) prior to the occurrence of the Effective Date.  As of the date of this Plan, there can be no assurance that any or all of such conditions will be satisfied (or waived).  Accordingly, there can be no assurance that this Plan will be consummated.

**5.6    Plan Releases May Not Be Approved**

There can be no assurance that the releases, as provided in Article XIV of this Plan, will be approved by the Bankruptcy Court.  Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from this Plan or this Plan not being confirmed.

**5.7    Reductions to Estimated Creditor Recoveries**

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of Distributions to creditors in such Class to be reduced substantially. The amount of cash realized from the liquidation of the Debtors' remaining Assets could be less than anticipated, which could cause the amount of Distributions to be reduced substantially.

**5.8    Certain Tax Considerations**

There are a number of material income tax considerations, risks, and uncertainties associated with the plan of liquidation of the Debtors described in this Combined Disclosure Statement and Plan.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THIS PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THIS PLAN.**

## ARTICLE VI
### TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article VII.  Additionally, DIP Claims and Superpriority Lien Claims were paid at the closing of the Sale Transaction.

**6.1    General Administrative Expenses**. Subject to the treatment of Professional Fees outlined below, each Holder of an Allowed General Administrative Expense, to the extent such Allowed General Administrative Expense has not already been paid during the Chapter 11 Cases and without any further action by such Holder, shall receive, in full satisfaction of its General Administrative Expense, Cash equal to the Allowed amount of such General Administrative Expense on the Effective Date unless otherwise agreed by (i) the Holder of such General Administrative Expense, and (ii) the Debtors or the Post-Effective Date Debtors; provided, however, that General Administrative Expenses incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such

applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. The U.S. Trustee shall not be required to file a request for payment of Administrative Expenses.

**6.2**    **Professional Fees**.

(a)    ***Final Fee Applications***. All final requests for payment of Professional Fees incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on the Post-Effective Date Debtors by the Professional Fee Deadline, which, for the avoidance of doubt, shall be no later than forty-five (45) days after the Effective Date, unless the Post-Effective Date Debtors agree otherwise in writing. Objections to Professional Fees must be filed with the Bankruptcy Court and served on the Post-Effective Date Debtors and the applicable Professional no later than twenty (20) days after the final request for payment of Professional Fees is filed. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Cases, the Allowed amounts of such Professional Fees shall be determined by the Bankruptcy Court. The Post-Effective Date Debtors shall pay Professional Fees in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.

For the avoidance of doubt, the immediately preceding paragraph shall not affect any professional-service Entity that is permitted to receive, and the Debtors are permitted to pay without seeking further authority from the Bankruptcy Court, compensation for services and reimbursement of expenses in the ordinary course of the Debtors' businesses (and in accordance with any relevant prior order of the Bankruptcy Court), which payments may continue notwithstanding the occurrence of Confirmation.

(b)    ***Professional Fee Escrow Account***. No later than the Effective Date, to the extent not already done, the Debtors shall fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fees Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders. Such funds shall not be considered property of the Estates of the Debtors or the Post-Effective Date Debtors. The amount of Allowed Professional Fees shall be paid in Cash to the Professionals by the Post-Effective Date Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fees are Allowed; *provided* that the Debtors' and the Post-Effective Date Debtors' obligations to pay Allowed Professional Fees shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. Unless otherwise required by the OCP Order, Professionals retained pursuant to the OCP Order shall not be required to file an application for payment of Professional Fees.

When all Allowed Professional Fees have been irrevocably paid in full, any remaining funds held in the Professional Fee Escrow Account shall be deemed Wind Down Reversionary Assets and distributed in accordance with this Plan.

(c)    ***Professional Fee Amount***. Professionals shall reasonably estimate their unpaid Professional Fees and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five (5) calendar days before the Effective Date, provided that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or

Post-Effective Date Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

*(d)* ***Post-Effective Date Fees and Expenses***. On the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Post- Effective Date Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

**6.3    DIP Claims**. The DIP Claims were satisfied in full through the payment of proceeds from the Sale Transaction.

**6.4    Priority Tax Claims**. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

# ARTICLE VII
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

For purposes of administrative convenience and efficiency, this Plan is a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors. This Plan does not provide for the substantive consolidation of the Debtors. Rather, this Plan constitutes a separate Plan proposed by each Debtor, and the classifications set forth in each Class of this Plan apply to each Debtor. Each Class constitutes a separate Sub-Class of Claims against, and Interests in, each of the Debtors, as applicable, and each such Sub-Class of a Class of Claims entitled to vote on this Plan shall vote as a single separate Class for, and the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to, each of the Debtors.

Claims and Interests, except for Administrative Expenses, DIP Claims, Priority Tax Claims, and Superpriority Lien Claims, are classified in the Classes set forth in this Article VII. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest, as applicable, in that Class. To the extent a specified Class does not include any Allowed Claims or Allowed Interests, as applicable, then such Class shall be deemed not to exist.

This Plan constitutes a separate chapter 11 plan of liquidation for each Debtor. Pursuant to section 1122, the classification of Claims and Interests is as follows:

**7.1    Class 1: Priority Non-Tax Claims**. In full and final satisfaction, compromise, settlement, and release of and in exchange for such Claim, on, or as soon as reasonably practicable following the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

**7.2    Class 2: Other Secured Claims**. In full and final satisfaction, compromise, settlement, and release of and in exchange for such Claim, on, or as soon as reasonably practicable following the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the Debtors' or Post-Effective Date Debtors' option:  (a) Cash equal to the amount of such Allowed Other Secured Claim; or (b) such other treatment with the Debtors, Post-Effective Date Debtors, or the Plan Administrator, as applicable, and the

Holder of such Allowed Other Secured Claim have agreed to in writing.

7.3     **Class 3: First Lien Claims**. In full and final satisfaction, settlement, discharge and release thereof, and in exchange therefor, each Holder of an Allowed First Lien Claim shall receive, from time to time following the Effective Date, ninety percent (90%) of their *pro rata* share of: (a) any available Litigation Proceeds from Preserved Causes of Action, and (b) any available Wind Down Reversionary Assets, including one hundred percent (100%) of the Withheld Proceeds upon the Debtors' or Post-Effective Date Debtors' receipt of the Insurance Refund.

7.4     **Class 4: General Unsecured Claims**. In full and final satisfaction, settlement, discharge, and release thereof, and in exchange therefor, each Holder of a General Unsecured Claim, which, for the avoidance of doubt, includes Holders of Second Lien Claims, shall receive, from time to time following the Effective Date, ten percent (10%) of:  (a) any available Litigation Proceeds from Preserved Causes of Action, and (b) any available Wind Down Reversionary Assets, to be distributed *pro rata*; provided, however, that the aggregate recovery to all Holders of General Unsecured Claims in Class 4 shall not exceed $500,000.

7.5     **Class 5: Intercompany Claims**. On the Effective Date, all Intercompany Claims shall be cancelled, released, and extinguished without Distribution, and will be of no further force or effect.

7.6     **Classes 6(a), 6(b) and 6(c): Interests**.

   *(a)*     **Class 6(a)**. On the Effective Date, all Interests in AeroCision Parent shall be cancelled as of the Effective Date, and the Holders thereof shall receive no Distribution on account of such Interests.

   *(b)*     **Class 6(b)**. On the Effective Date, all Interests in AeroCision shall be reinstated and vest in Reorganized AeroCision Parent solely for corporate governance purposes, and the Holders thereof shall receive no Distribution on account of such Interests.

   *(c)*     **Class 6(c)**. On the Effective Date, all Interests in Numet shall be reinstated and vest in Reorganized AeroCision Parent solely for corporate governance purposes, and the Holders thereof shall receive no Distribution on account of such Interests.

7.7     **Reservation of Rights Regarding Claims and Interests**. Except as otherwise explicitly provided in this Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

# ARTICLE  VIII
## ACCEPTANCE OR REJECTION OF THIS PLAN

8.1     **Classes Entitled to Vote**. Because Claims in Classes 3 and 4 are Impaired and Holders thereof may receive or retain property or an interest in property under this Plan, **only Holders of Claims in Classes 3 and 4 shall be entitled to vote to accept or reject this Plan**.

8.2     **Acceptance by Impaired Classes of Claims or Interests**. In accordance with section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted this Plan if this Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject this Plan.

**8.3     Presumed Acceptance by Unimpaired Classes**. Because Claims in Classes 1, and 2 are Unimpaired, pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in Classes 1 and 2 are presumed to have accepted this Plan and, therefore, such Holders of Claims are not entitled to vote to accept or reject this Plan.

**8.4     Presumed Rejections by Impaired Classes**. Because Holders of Claims or Interests in Classes 5, 6(a), 6(b), and 6(c) are not entitled to receive or retain any property under this Plan, pursuant to section 1126(g) of the Bankruptcy Code, Holders of Claims or Interests in Classes 5, 6(a), 6(b), and 6(c) are deemed to have rejected this Plan and are not entitled to vote to accept or reject this Plan.

**8.5     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**. To the extent that any Impaired Class rejects this Plan or is deemed to have rejected this Plan, the Debtors reserve the right to request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan, the documents submitted in support thereof or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**8.6     Subordinated Claims**. The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the Distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**8.7     Controversy Concerning Impairment**. If a controversy arises as to whether any Claim or Interest is Impaired under this Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**8.8     Elimination of Vacant Classes**. Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from this Plan for all purposes, including for purposes of determining acceptance of this Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE IX
## IMPLEMENTATION OF THIS PLAN

**9.1     Implementation of this Plan**. This Plan will be implemented by, among other things, the appointment of the Plan Administrator as the sole officer or manager of each of the Post-Effective Date Debtors as of the Effective Date.

On the Effective Date, the AeroCision Assets will vest in, and be assigned to, Reorganized AeroCision, and the Numet Assets will vest in, and be assigned to, Reorganized Numet. Each of Reorganized AeroCision and Reorganized Numet will continue to exist for purposes of satisfying the Debtors' obligations under the Sale Documents until termination of the TSA. The operations of each of Reorganized AeroCision and Reorganized Numet will be overseen by the Plan Administrator. The costs and expenses incurred by the Post-Effective Date Debtors shall be funded from the Wind Down Assets solely to the extent such costs and expenses are not required to be paid by BG Acquisition pursuant to the TSA or other Sale Documents.

**9.2    Source of Consideration**. All consideration necessary to make all monetary payments in accordance with this Plan shall be obtained from Cash on hand as of the Effective Date and the Wind Down Assets.

**9.3    Vesting of Wind Down Assets**. Except as otherwise provided herein or in the TSA, on the Effective Date, the Wind Down Assets shall vest in the Estates of the Post-Effective Date Debtors, free and clear of all Claims, liens, charges, other encumbrances and Interests.  On and after the Effective Date, the Plan Administrator may use, acquire, or dispose of the Wind Down Assets and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**9.4    Termination of Directors, Officers, and Managers and Appointment of Plan Administrator**. Except as otherwise provided herein or in the TSA, on the Effective Date, each of the Debtors' directors, officers, and managers shall be terminated automatically without the need for any corporate action or approval and without the need for any corporate filings, and shall have no continuing obligations to the Debtors following the occurrence of the Effective Date.

From and after the Effective Date: (i) Reorganized AeroCision Parent shall be deemed to be the sole member and manager of each of Reorganized AeroCision and Reorganized Numet; (ii) the Plan Administrator shall be the sole officer of each of Reorganized AeroCision and Reorganized Numet; (iii) the Plan Administrator shall be the sole member and manager of Reorganized AeroCision Parent; and (iv) the Plan Administrator shall be the sole officer and director of Reorganized AeroCision Parent. The Plan Administrator shall serve in such capacities as set forth herein through the earlier of the date the applicable Debtor is dissolved in accordance with the Plan or the date that the Plan Administrator resigns or is otherwise unable to serve; *provided* that any successor Plan Administrator shall serve in such capacities.

**9.5    Wind-Up and Dissolution of the Debtors**. Upon the latter of the conclusion of the Wind Down or the termination of the TSA, the Plan Administrator shall be authorized to dissolve the Post-Effective Date Debtors, subject to the provisions of the Wind Down Organizational Documents, without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its shareholder or any payments to be made in connection therewith, other than the filing of a certificate of dissolution with the appropriate governmental authorities, pursuant to Section 303 of the Delaware General Corporation Law codified at title 8 of the Delaware Code or other applicable state law.

**9.6    Plan Administrator and Plan Administration Agreement**. From and after the Effective Date, except as expressly set forth in this Plan or the Confirmation Order, pursuant to and in accordance with the terms and provisions of this Plan and the Plan Administration Agreement, the Plan Administrator shall be empowered and directed to: (i) take all steps and execute all instruments and documents necessary to make Distributions to Holders of Allowed Claims, and to perform the duties assigned to the Plan Administrator under this Plan or the Plan Administration Agreement; (ii) comply with this Plan and the obligations under this Plan; (iii) employ, retain or replace professionals to represent the Post-Effective Date Debtors or the Plan Administrator with respect to the Plan Administrator's responsibilities; (iv) object to Claims and Interests as provided in this Plan and prosecute such objections; (v) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment or allowance of any Claims or Interests; (vi) exercise such other powers as may be vested in the Plan Administrator pursuant to this Plan, the Plan Administration Agreement or any other Order of the Bankruptcy Court, including the Confirmation Order, or otherwise act on behalf of and for the Debtors and the Plan Administrator from and after the Effective Date; (vii) file applicable tax returns for the Debtors; (viii) monetize any of the Wind Down Assets; and (ix)  subject to the provisions of the Wind Down Organizational Documents, pursue the Preserved Causes of Action in accordance with the best interests of the Post-Effective Date Debtors. No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any

Cause of Action against it as any indication that the Plan Administrator will not pursue any and all available Preserved Causes of Action against it and all rights associated therewith are expressly reserved, except as otherwise provided in this Plan.

The Plan Administrator shall have the exclusive right, authority, and discretion to investigate and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Preserved Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court, in each subject to the provisions of the Wind Down Organizational Documents.

In the event any provision in the Plan Administration Agreement conflicts with this Plan, the terms of this Plan shall prevail.

The Plan Administrator may, without the need for further Court approval, retain or employ agents, financial advisors, attorneys, consultants, independent contractors, representatives and other professionals to advise the Plan Administrator in the performance of the Plan Administrator's duties.  The Plan Administrator may, without further order of the Bankruptcy Court, employ professionals to assist in carrying out the Plan Administrator's duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the Wind Down Assets in accordance with this Plan and the Plan Administration Agreement.  The Plan Administrator shall pay from the Wind Down Assets the reasonable fees and expenses of such professionals upon the monthly submission of statements to the Plan Administrator without further order of the Bankruptcy Court.

The Plan Administrator shall be authorized to obtain and pay for, out of the funds of the Estates, all reasonably necessary insurance coverage for the Plan Administrator, the Plan Administrator's professionals, and the Debtors, their officers and managers, including, but not limited to, coverage with respect to: (i) any property that is or may in the future become the property of the Debtors or their Estates; and (ii) the Plan Administrator Expenses, the latter of which insurance coverage may remain in effect for a reasonable period of time after the termination of the Plan Administration Agreement, as determined by the Plan Administrator.

Any and all reasonable and documented costs and expenses incurred by the Plan Administrator in connection with the Wind Down shall be paid from the Wind Down Assets, subject to (i) the Wind Down Budget and (ii) the terms and conditions of the Wind Down Organizational Documents and the Plan Administration Agreement, as applicable.

In the event of the resignation or removal, liquidation, dissolution, death, or incapacity of the Plan Administrator, the Wind Down Organizational Documents shall set forth the process for appointing a new Plan Administrator.

**9.7     Wind Down Organizational Documents**. The Wind Down Organizational Documents shall be in form and substance acceptable to the Plan Administrator, with the consent of the Debtors (which consent shall not be unreasonably withheld, conditioned, or delayed).

**9.8     Wind Down Budget**. The Post-Effective Date Debtors shall adhere to the Wind Down Budget, which shall be in form and substance acceptable to the Plan Administrator, with the consent of the Senior Agent (which consent shall not be unreasonably withheld, conditioned, or delayed) and the consent of the

Debtors and Post-Effective Date Debtors (which consent shall not be unreasonably withheld, conditioned, or delayed).

**9.9    Distributions by Plan Administrator**. The Plan Administrator, on behalf of the Post-Effective Date Debtors, shall make continuing efforts to monetize and distribute all Wind Down Assets in accordance with this Plan and the Plan Administration Agreement.

**9.10    Limitation of Liability; Indemnification**. The Plan Administrator and all of its respective designees, employees, agents, representatives or professionals shall not be liable for the act or omission of any other member, designees, agent or representative of the Plan Administrator, nor shall they be liable for any act or omission taken or omitted to be taken in their respective capacities, other than acts or omission resulting from willful misconduct, gross negligence, or actual fraud.  The Plan Administrator shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee.  The Plan Administrator may, in connection with the performance of its functions, consult with attorneys, accountants, financial advisors and agents, which consultation may act as a defense for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons. Notwithstanding such authority, the Plan Administrator shall not be under any obligation to consult with attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability, unless such determination is based on willful misconduct, gross negligence or actual fraud.  The Post-Effective Date Debtors shall indemnify and hold harmless the Plan Administrator and its designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties or the implementation or administration of this Plan; *provided, however*, that no such indemnification will be made to such persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

**9.11    Compensation and Duties of Plan Administrator**. The salient terms of the Plan Administrator's employment, including the Plan Administrator's duties and compensation, shall be set forth in the Plan Administration Agreement. The Plan Administrator shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases, as set forth in the Plan Administration Agreement. The Plan Administrator shall also be reimbursed for all documented, actual, reasonable, and necessary out-of-pocket expenses incurred in the performance of his or her duties under the Plan Administration Agreement.

**9.12    Privilege and Immunities**.  Any privilege or immunity attaching to any documents or communications (whether written or oral), including, but not limited to, any attorney-client privilege, work- product privilege, joint-interest privilege, or any other evidentiary privileges or immunity, in each case relating to any Preserved Causes of Action held by the Debtors pursuant to applicable federal, state, and other law shall vest in the Post-Effective Date Debtors as of the Effective Date. The Debtors and the Post-Effective Date Debtors are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses, and the Debtors shall transfer any and all prepetition case files and work product, if any, from the Debtors' current and former outside counsel (or unredacted copies of such files, as appropriate) to the Plan Administrator within thirty (30) days of the Effective Date; *provided*, that, for the avoidance of doubt, such production shall not include (i) any materials relating to the preparation, filing, or prosecution of the Chapter 11 Cases or (ii) any internal communications of any advisors to the Debtors that are Released Parties; *provided*, *further*, that notwithstanding the foregoing proviso, the Plan Administrator may request, and such advisors shall provide, any primary documents or final work product

identified (in such advisors' professional judgement) as materially relevant to the prosecution of any Preserved Causes of Action.

No action taken by the Debtors, the Post-Effective Date Debtors, or the Plan Administrator shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, including any attorney-client privilege or work product privilege attaching to any documents or communications (whether written or oral).

**9.13    Company Action**.

All matters expressly provided for under this Plan that would otherwise require approval of the stockholders, members or managers of one or more of the Debtors, including but not limited to, the dissolution or merger of any of the Debtors, shall be deemed to be in effect from and after the Effective Date pursuant to the applicable law of the states in which the Debtors are organized without any requirement of action by the stockholders, members or managers of the Debtors.

**9.14    Standing to Pursue Debtors' Rights, Including Preserved Causes of Action**.

Except as otherwise provided in this Plan, as of the Effective Date, the Debtors, together with any successor or successors in interest and assigns, including, without limitation, the Post-Effective Date Debtors, the Plan Administrator, and any other person or entity that claims or might claim through, on behalf of, or for the benefit of any of the foregoing, shall be deemed to have preserved all Preserved Causes of Action, and shall have standing to pursue such Preserved Causes of Action.

**9.15    Certain Tax Considerations.**

*(a)    General*. **HOLDERS CONCERNED WITH HOW THIS PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND ADVISORS.  THE BELOW TAX SUMMARY HAS BEEN PROVIDED FOR GENERAL INFORMATIONAL PURPOSES ONLY.   THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THIS PLAN ARE COMPLEX.    NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.**

The following discussion summarizes certain United States federal income tax consequences of this Plan to the Debtors and to certain Holders of Claims.  This discussion is based on the IRC, the Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rulings and pronouncements of the IRS, all as in effect on the date hereof.  Legislative, judicial, or administrative changes in law or its interpretation, as well as other events occurring after the date of this Disclosure Statement, and which may be retroactive, could materially alter the tax treatment described below.  Furthermore, this discussion is not binding on the IRS or any other tax authority.  There is no assurance that a tax authority will not take, or that a court will not sustain, a position with respect to the tax consequences of this Plan that differs from the tax consequences described below.  No ruling has been or will be sought from the IRS, no opinion of counsel has been or will be obtained, and no representations are made regarding any tax aspect of this Plan.

The following discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of such Holder's facts and circumstances, or to certain types of Holders subject to special treatment under the IRC (for example, governmental entities and entities exercising governmental authority, non-U.S. taxpayers, banks and certain other financial institutions,

broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, persons holding a Claim as part of a hedge, straddle, constructive sale, conversion transaction, or other integrated transaction, Holders that are or hold their Claims through a partnership or other pass-through entity, and Persons that have a functional currency other than the U.S. dollar). This summary does not address state, local, or non-United States tax consequences of this Plan, nor does this summary address federal taxes other than income taxes. Furthermore, this discussion generally does not address U.S. federal income tax consequences to Holders that are unimpaired under this Plan or that are not entitled to receive or retain any property under this Plan or to Persons who are deemed to have rejected this Plan.

     (b)     *Federal Income Tax Consequences to the Debtors*.

     (i)     *Sale of Assets*. The Sale constituted a taxable disposition of the Assets. The Debtors will recognize gain or loss equal to the difference between the amount received for those Assets in the Sale and the Debtors' adjusted tax basis in those Assets. The Debtors expect to have tax losses generated from other activities in the current year that may be used to offset gain from the Sale. To the extent that current year losses are insufficient to offset all gain realized upon the Sale, net operating losses ("**NOLs**") arising from the Debtors' operations in prior taxable years may be available to offset such excess gain, but only to the extent of 80% of such excess gain.

     (ii)     *Vesting in and Assignment of Assets; Dissolution of Post-Effective Date Debtors*. Pursuant to this Combined Plan and Disclosure Statement, on the Effective Date, the New Membership Interests in Reorganized AeroCision Parent will be issued to and vest in the Plan Administrator; Interests in AeroCision will vest in, and be assigned to, Reorganized AeroCision Parent; AeroCision Assets will vest in Reorganized AeroCision; Interests in Numet will vest in, and be assigned to, Reorganized AeroCision Parent; and Numet Assets will vest in Reorganized Numet. Upon termination of the TSA pursuant to the Sale Documents, the Plan Administrator will wind-down and dissolve the Post-Effective Date Debtors. Accordingly, following such transfers and transactions to effectuate the wind-down and dissolution, the Debtors should be treated as having completely liquidated for U.S. federal income.

     (iii)     *Cancellation of Indebtedness and Reduction of Tax Attributes*. For U.S. federal income tax purposes, gross income generally includes income from cancellation of indebtedness ("**COD**"). In general, the Debtors will have COD income equal to the excess of the amount of debt discharged pursuant to this Plan over the adjusted issue price of the debt, less the amount of cash and the fair market value of property distributed to holders of the debt. Various statutory or judicial exceptions limit the incurrence of COD income (such as where payment of the cancelled debt would have given rise to a tax deduction). COD income also includes interest accrued on obligations of the Debtors but unpaid at the time of discharge. An exception to the recognition of COD income applies to a debtor in a chapter 11 bankruptcy proceeding. Bankrupt debtors generally do not include COD in taxable income, but must instead reduce certain tax attributes (such as NOLs, capital losses, certain credits, and the excess of the tax basis of the debtor's property over the amount of liabilities outstanding after discharge) by the amount of COD income that was excluded under the bankruptcy exception. Tax benefits are reduced after the tax is determined for the year of discharge. Existing NOLs will therefore be available to offset up to 80% of

gains on asset sales in the year of the discharge regardless of the amount by which NOLs are reduced due to COD income.

(c)     ***Exemption from Certain Transfer Taxes***. To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale by any Debtor, or any transfer from any Entity pursuant to, in contemplation of, or in connection with this Plan or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

(d)     ***Federal Income Tax Consequences to Holders***.

(i)     ***Characterization***. The tax treatment of Holders, and the character, amount, and timing of income, gain, or loss recognized as a consequence of this Plan and any Distributions pursuant to this Plan may vary, depending upon, among other things: (A) whether the Claim (or a portion of the Claim) is for principal or interest; (B) the type of consideration the Holder receives for the Claim, (C) whether the Holder receives Distributions under this Plan in more than one taxable year; (D) the manner in which the Holder acquired the Claim; (E) the length of time that the Claim has been held; (F) whether the Claim was acquired at a discount; (G) whether the Holder of the Claim has taken a bad debt deduction with respect to part or all of the Claim; (H) whether the Holder of the Claim has previously included in income accrued but unpaid interest on the Claim; (I) the Holder's method of tax accounting; (J) whether the Claim is an installment obligation for U.S. federal income tax purposes; (K) whether the Claim, and any instrument received in exchange for the Claim, is a "security" for U.S. federal income tax purposes; and (L) whether and the manner in which the "market discount" rules of the IRC apply to the Holder of the Claim.

(ii)     ***Gain and Loss Recognition***. Holders that receive Cash and property other than stock and securities for their Claim will recognize gain or loss for U.S. federal income tax purposes equal to the difference between the "amount realized" by the Holder and the Holder's tax basis in the Claim. The "amount realized" is the sum of the amount of cash and the fair market value of any other property received under this Plan in respect of the Claim (other than amounts received in respect of a Claim for accrued unpaid interest). The Holder's tax basis in the Claim (other than a Claim for accrued unpaid interest) is generally the Holder's cost, though tax basis could be more or less than cost depending on the specific facts of the Holder. Any gain or loss realized may be capital gain or loss or ordinary gain or loss, depending on the circumstances of the Holder.

(iii)     ***Interest Issues***. Holders that previously included in income accrued but unpaid interest on a Claim may be entitled to a deductible loss to the extent such interest is not satisfied under this Plan. Conversely, a Holder has ordinary income to the extent of the

amount of cash or the fair market value of property received in respect of a Claim for (or the portion of a Claim treated as allocable to) accrued unpaid interest that was not previously included in income by the Holder.  This Plan treats all amounts payable to a Holder as principal until the principal amount of the Claim is paid in full.  The Debtors' tax returns will be filed in a manner consistent with this allocation, but it is uncertain whether the IRS will respect this allocation.  The IRS may take the position that payments should be allocated first to interest or should be pro-rated between principal and interest. If the IRS prevails in this assertion, Holders may be required to recognize ordinary interest income even though they have an overall loss (and possibly a capital loss, the deductibility of which may be limited) with respect to such Holder's Claims.  Each Holder is urged to consult such Holder's own tax advisor regarding the amount of such Holder's Claim allocable to accrued unpaid interest and the character of any loss with respect to accrued but unpaid interest that the Holder previously included in income.

(iv)    ***Bad Debt and Worthless Security Deductions***. A Holder who receives, in respect of such Holder's Claim, an amount that is less than such Holder's tax basis in the Claim may be entitled to a bad debt or worthless securities deduction. The rules governing the character, timing, and amount of these deductions depend upon the facts and circumstances of the Holder, the obligor, and the instrument with respect to which the deduction is claimed, including whether (i) the Holder is a corporation or (ii) the Claim constituted (a)  a debt created or acquired (as the case may be) in connection with the Holder's trade or business or (b) a debt, the loss from worthlessness of which is incurred in the Holder's trade or business. A Holder that previously recognized a loss or deduction in respect of such Holder's Claim may be required to include in income amounts received under this Plan that exceed the Holder's adjusted basis in its Claim.

(iv)    ***Installment Obligations***. A Holder of a Claim that is an installment obligation for U.S. federal income tax purposes may be required to recognize any gain or loss remaining with respect to such obligation if, pursuant to this Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold, or otherwise disposed of within the meaning of Section 453B of the IRC.

(v)    ***Market Discount***. A Holder of a Claim that acquires a Claim at a market discount generally is required to treat any gain realized on the disposition of the Claim as ordinary income to the extent of the market discount that accrued during the period the Claim was held by the Holder and was not previously included in income by the Holder.

(vi)    ***Withholding***. Amounts paid to Holders are subject to generally applicable withholding, information, and backup withholding rules.  This Plan authorizes the Debtors and the Plan Administrator, as applicable, to withhold and report amounts required by law to be withheld and reported.  Amounts properly withheld from Distributions to a Holder and paid over to the applicable taxing authority for the account of such Holder will be treated as amounts distributed to such Holder.  Holders are required to provide the Debtors and the Plan Administrator, as applicable, with the information necessary to effect information reporting and withholding as required by law.  Notwithstanding any other provision of this Plan, Holders of Claims that receive a Distribution pursuant to this Plan are responsible for the payment and satisfaction of all tax obligations, including income, withholding, and other tax obligations imposed with respect to the Distribution, and no Distribution shall be made until a Holder has made arrangements satisfactory to the Debtors or the Plan Administrator, as applicable, for the payment and satisfaction of such obligations.

30926754.12

48

(vii)    **Backup Withholding**. Holders may be subject to backup withholding on payments pursuant to this Plan unless the Holder (A) is not a corporation and is not otherwise exempt from backup withholding and, when required, demonstrates that such Holder is exempt from backup withholding requirements or (B) provides a correct taxpayer identification and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a previous failure(s) to report dividend and interest income. Amounts withheld due to backup withholding will be credited against the Holder's federal income tax liability and excess withholding may be refunded if a timely claim for refund (generally, a U.S. federal income tax return) is filed with the IRS.

(viii)    **Certain Disclosure Requirements**. Treasury regulations require tax return disclosure of certain types of transactions that result in the taxpayer claiming a loss in excess of specified thresholds.  Holders are urged to consult their own tax advisors regarding these regulations and whether the transactions contemplated by this Plan would be subject to these regulations and would require such disclosure.]

## ARTICLE X
## PROVISIONS GOVERNING DISTRIBUTIONS

**10.1    Distributions for Allowed Claims**

Except as otherwise provided herein or as ordered by the Bankruptcy Court, all Distributions to Holders of Allowed Claims as of the applicable Distribution Date shall be made on or as soon as practicable after the applicable Distribution Date.  Distributions on account of Claims that first become Allowed Claims after the applicable Distribution Date shall be made pursuant to the terms of this Plan and on the day selected by the Plan Administrator.

The Plan Administrator may accelerate any Distribution Date with respect to Distributions if the facts and circumstances so warrant and to the extent not inconsistent with this Plan.

Distributions made as soon as reasonably practicable after the Effective Date or such other date set forth herein shall be deemed to have been made on such date**.**

**10.2    Interest of Claims**. Expect to the extent provided in section 506(b) of the Bankruptcy Code, this Plan, or the Confirmation Order, post-petition interest shall not accrue or be paid on Claims, and no Holder of an Allowed Claim shall be entitled to interest accruing on any Claim from and after the Petition Date.

**10.3    Distributions by Plan Administrator as Disbursement Agent**. From and after the Effective Date, the Plan Administrator shall serve as the disbursement agent under this Plan with respect to Distributions to Holders of Allowed Claims; *provided*, that the Plan Administrator may hire professionals or consultants to assist with making disbursements or to act as the disbursement agent.  The Plan Administrator shall cause to be made all Distributions required to be made to such Holders of Allowed Claims pursuant to this Plan and the Plan Administration Agreement.  The Plan Administrator shall not be required to give any bond or surety or other security for the performance of the Plan Administrator's duties as disbursement agent unless otherwise ordered by the Bankruptcy Court.

**10.4    Means of Cash Payment**. Cash payments under this Plan shall be made, at the option, and in the sole discretion, of the Plan Administrator, by wire, check, or such other method as the Plan Administrator deems appropriate under the circumstances.  Pursuant to Section 10.7 of this Plan, cash payments in the form of checks issued by the Plan Administrator shall be null and void if not cashed within ninety (90) days

of the date of the issuance thereof and deemed undeliverable Distributions.  Following the expiration of ninety (90) days after issuance of such null and void checks, in accordance with Section 10.12 of this Plan, amounts in respect of these undeliverable Distributions shall be become unrestricted Wind Down Assets and shall be redistributed to Holders of Allowed Claims after reserving as necessary for payment of Plan Administrator Expenses and otherwise in compliance with this Plan and the Plan Administration Agreement.  Such Holder shall be deemed to have forfeited its right to any reserved and future Distributions from the Plan Administrator, and any Claims held by such Holder shall be deemed cancelled, and the Claims of such Holder shall be forever barred.

**10.5**    **Fractional Distributions**. Notwithstanding anything in this Plan to the contrary, no payment of fractional cents shall be made pursuant to this Plan.  Whenever any payment of a fraction of a cent under this Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

**10.6**    **De Minimis Distributions**. Notwithstanding anything to the contrary contained in this Plan, the Plan Administrator shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $100.  Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $100 shall be forever barred from asserting such Claim against Wind Down Assets.

**10.7**    **Delivery of Distributions; Unclaimed Distributions**. All Distributions to Holders of Allowed Claims shall be made at the address of such Holder as set forth in the claims register maintained in the Chapter 11 Cases (subject to any transfer effectuated pursuant to Bankruptcy Rule 3001(e) or, after the Effective Date, a change of address notification provided by a Holder in a manner reasonably acceptable to the Plan Administrator) or, in the absence of a Filed Proof of Claim, the Schedules. The responsibility to provide the Plan Administrator a current address of a Holder of Claims shall always be the responsibility of such Holder and at no time shall the Plan Administrator have any obligation to determine a Holder's current address.  Nothing contained in this Plan shall require the Plan Administrator to attempt to locate any Holder of an Allowed Claim. Amounts in respect of undeliverable Distributions made by the Plan Administrator shall be held in trust on behalf of the Holder of the Claim to which they are payable by the Plan Administrator until the earlier of the date that such undeliverable Distributions are claimed by such Holder and the date ninety (90) days after the date the undeliverable Distributions were made.  Following the expiration of ninety (90) days after the date the undeliverable Distributions were made, the amounts in respect of undeliverable Distributions shall be become unrestricted Wind Down Assets and shall be redistributed to Holders of Allowed Claims after reserving as necessary for payment of Plan Administrator Expenses and otherwise in compliance with this Plan and the Plan Administration Agreement. Such Holder shall be deemed to have forfeited its right to any reserved and future Distributions from the Plan Administrator and such interests shall be deemed cancelled, and the Claims of such Holder shall be forever barred.

**10.8**    **Withholding, Payment and Reporting Requirements With Respect to Distributions**. All Distributions under this Plan shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions shall be subject to any such withholding, payment, and reporting requirements.  The Plan Administrator shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.  The Plan Administrator may require, in the Plan Administrator's sole and absolute discretion and as a condition to the receipt of any Distribution, that the Holder of an Allowed Claim complete and return to the Plan Administrator the appropriate Form W-8 or Form W-9, as applicable, to each Holder.  Notwithstanding any other provision of this Plan, (a) each

30926754.12

50

Holder of an Allowed Claim that is to receive a Distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed upon the Plan Administrator in connection with such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements reasonably satisfactory to the Plan Administrator for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Plan Administrator in connection with such Distribution.

**10.9     Setoffs**. Except as otherwise expressly provided for in this Plan, each Debtor and the Plan Administrator, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law or as may be agreed to by the Holder of a Claim or an Interest, may set off against any Allowed Claim or Allowed Interest and the Distributions to be made pursuant to this Plan on account of such Allowed Claim or Allowed Interest, if any, (before any Distribution is made), any claims, rights and Causes of Action of any nature that such Debtor or the Plan Administrator, as applicable, may hold against the Holder of such Allowed Claim or Allowed Interest, to the extent such claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to this Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to this Plan shall constitute a waiver or release by such Debtor of any such claims, rights and Causes of Action that such Debtor may possess against such Holder.  In no event shall any Holder of Claims or Interests be entitled to set off any Claim or Interest against any claim, right or Cause of Action of the Debtor unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date and the Bankruptcy Court grants such relief.  For the avoidance of doubt, the Filing of a Proof of Claim is sufficient to preserve a right of setoff hereunder.

**10.10    No Distribution in Excess of Allowed Amounts**. Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim.

**10.11    Allocation of Distributions**. The Plan Administrator may, in the Plan Administrator's sole discretion, make Distributions jointly to any Holder of a Claim and any other Entity who has asserted, or whom the Plan Administrator has determined to have, an interest in such Claim; *provided, however*, that the Plan Administrator shall provide notice of such Distribution to any Holder of a Claim or other Entity that has asserted an interest in such Claim.

**10.12    Forfeiture of Distributions**. If the Holder of a Claim fails to cash a check payable to it within the time period set forth in Section 10.4, fails to claim an undeliverable Distribution within the time limit set forth in Section 10.7, or fails to complete and return to the or Plan Administrator the appropriate Form W- 8 or Form W-9 within one hundred twenty (120) days of a request for the completion and return to it of the appropriate form pursuant to Section 10.8, then such Holder shall be deemed to have forfeited its right to any reserved and future Distributions and the Claims of such Holder shall be forever barred.  The forfeited Distributions shall become Wind Down Assets and shall be redistributed to Holders of Allowed Claims after reserving as necessary for payment of Plan Administrator Expenses and otherwise in compliance with this Plan and the Plan Administration Agreement.  In the event the Plan Administrator determines that any such amounts are too small in total to redistribute cost-effectively to Holders of Allowed Claims, the Plan Administrator may instead donate them to a charitable organization(s) free of any restrictions thereon, notwithstanding any federal or state escheat laws to the contrary.

## ARTICLE XI
## PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION OF CLAIMS

**11.1    Claims Administration Responsibility**. Except as otherwise specifically provided in this Plan and the Plan Administration Agreement, after the Effective Date, the Plan Administrator shall have the authority (a) to file, withdraw, or litigate to judgment objections to Claims, (b) to settle, compromise, or Allow any Claim or Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, (c) to amend the Schedules in accordance with the Bankruptcy Code, and (d) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  Any agreement entered into by the Plan Administrator (acting in accordance with the terms of the Plan Administration Agreement) with respect to the Allowance of any Claim shall be conclusive evidence and a final determination of the Allowance of such Claim.

**11.2    Claims Objections**. All objections to Claims shall be Filed on or before the Claims Objection Deadline, which date may be extended by the Bankruptcy Court upon a motion filed by the Post-Effective Date Debtors or the Plan Administrator on or before the Claims Objection Deadline with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 as of the filing of such motion.  If a timely objection has not been Filed to a Proof of Claim or the Schedules have not been amended with respect to a Claim that was scheduled by the Debtors but was not set forth in the Schedules by the Debtors as contingent, unliquidated, and/or disputed, then the Claim to which the Proof of Claim or the Claim set forth in the Schedules relates will be treated as an Allowed Claim.

**11.3    Estimation of Contingent or Unliquidated Claims**. The Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute the Allowed amount of such Claim.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

**11.4    Expungement and Disallowance of Certain Claims**. Any Claim that has been paid, satisfied or otherwise dealt with or treated in this Plan may be adjusted or expunged on the Claims Register at the direction of the Plan Administrator on or after fourteen (14) calendar days after the date on which notice of such adjustment or expungement has been filed with the Bankruptcy Court, without an objection to such Claim having to be filed, and without any further action, order or approval of the Bankruptcy Court.

**11.5    Distributions on Account of Disputed Claims**. Distributions may be made on account of an undisputed portion of a Disputed Claim.  The Plan Administrator shall, on the applicable Distribution Date, make Distributions on account of any Disputed Claim (or portion thereof) that has become an Allowed Claim.  Such Distributions shall be based upon the Distributions that would have been made to the Holder of such Claim under this Plan if such Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

**11.6    Amendments to Claims**. On or after the Effective Date, a Claim may not be filed or amended to increase liability or to assert new liabilities without the prior authorization of the Bankruptcy Court or the Plan Administrator and any such new or amended Claim filed without prior authorization shall be deemed Disallowed in full without any further action.

**11.7    Claims Paid and Payable by Third Parties**. A Claim shall be Disallowed without an Objection thereto having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors, or the Plan Administrator.

**11.8    Adjustment to Claims Without Objection**. Any Claim that has been paid or otherwise satisfied may be designated on the Claims Register as such at the direction of the Plan Administrator by the Filing of a notice of satisfaction by the Plan Administrator, and without any further notice to or action, order, or approval of the Bankruptcy Court.

**ARTICLE XII**
**EXECUTORY CONTRACTS**

**12.1    Executory Contracts Deemed Rejected**. On the Effective Date, each Executory Contract will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract (i) is specifically designated on the Assumption Schedule filed with the Plan Supplement, (ii) is subject to a pending motion to assume such Executory Contract as of the Effective Date, or (iii) was previously assumed, assumed and assigned, or rejected by the Debtors in the Chapter 11 Cases, including in connection with the Sale Transaction.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all rejections of Executory Contracts pursuant to this Article and sections 365(a) and 1123 of the Bankruptcy Code.  Any and all Claims arising from the rejection of Executory Contracts under this Plan must be filed and served on the Plan Administrator no later than thirty (30) days after the Effective Date, provided that the foregoing deadline shall apply only to Executory Contracts that are rejected automatically by operation of this Article XII of this Plan.

**ARTICLE XIII**
**CONFIRMATION AND CONSUMMATION OF THIS PLAN**

**13.1    Conditions Precedent to the Effective Date**. Each of the following is a condition precedent to the occurrence of the Effective Date:

*(a)*    the Bankruptcy Court shall have entered the Confirmation Order (and such order shall be a Final Order) in form and substance acceptable to the Debtors and the First Lien Agent;

*(b)*    the applicable parties shall have agreed to the Wind Down Budget in accordance with the terms set forth herein;

*(c)*    the Professional Fee Escrow Account shall have been funded with Cash in an amount equal to the Professional Fee Amount;

*(d)*    the Wind Down Organizational Documents and the Plan Administration Agreement shall have been approved and executed by the parties thereto; and

*(e)*    all actions, documents, and agreements necessary to implement this Combined Disclosure Statement and Plan, including, without limitation, all actions, documents, and agreements necessary to implement any transactions contemplated under this Combined Disclosure Statement and Plan, shall have been effectuated or executed;

*provided*, that, notwithstanding when a condition precedent to the Effective Date occurs, for purposes of this Plan, such condition precedent shall be deemed to have occurred simultaneously with the last condition precedent to the Effective Date to occur.

**13.2    Effective Date Notice**. On or before five (5) Business Days after the Effective Date, the Plan Administrator shall mail or cause to be mailed to all parties listed in the creditor matrix maintained by the Notice and Claims Agent the Effective Date Notice, informing such parties of (a) the occurrence of the Effective Date, (b) the deadline to file Claims arising from the rejection of Executory Contracts under Article XII of this Plan, (c) the Professional Fee Deadline; and (d) such other matters as the Plan Administrator deems appropriate or as may be ordered by the Bankruptcy Court.

**13.3    Waiver of Conditions Precedent to the Effective Date**. The Debtors may at any time, without notice or authorization of the Bankruptcy Court, waive in writing any or all of the conditions precedent to the Effective Date set forth in this Article, whereupon the Effective Date shall occur without further action by any Entity.  The Debtors reserve the right to assert that any appeal from the Confirmation Order shall be moot after the Effective Date of this Plan.

**13.4    Effect of Non-Occurrence of Effective Date**. If each of the conditions specified in this Article have not been satisfied or waived in the manner provided herein within sixty (60) calendar days after the Confirmation Date (or such later date as may be agreed to by the Debtors and the First Lien Agent), then: (i) the Confirmation Order shall be vacated and of no further force or effect; (ii) no Distributions under this Plan shall be made; (iii) the Debtors and all Holders of Claims against or Interests in the Debtors shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) all of the Debtors' obligations with respect to Claims and Interests shall remain unaffected by this Plan and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, and this Plan shall be deemed withdrawn. Upon such occurrence, the Debtors shall File a written notification with the Bankruptcy Court and serve it upon such parties as the Bankruptcy Court may direct.

**ARTICLE  XIV**
**EFFECTS OF CONFIRMATION**

**14.1    Exculpation, Releases, and Injunctions**

**The exculpations, releases, and injunctions provided for in Section 14.1 of this Plan shall be effective upon the Effective Date.**

**(a)    Exculpation and Limitation of Liability. Notwithstanding any other provision of this Plan, the Exculpated Parties shall not have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or any of their Affiliates, or any of their successors or assigns, for any act or omission taken on or after the Petition Date and prior to or on the Effective Date relating to, in any way, or arising from (i) the Chapter 11 Cases, (ii) formulating, negotiating or implementing this Combined Disclosure Statement and Plan or any contract, instrument, release or other agreement or document created or entered into in connection with this Combined Disclosure Statement and Plan; (iii) the Sale Transaction; (iv) any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring, sale or liquidation of the Debtors; (v) the solicitation of acceptances of this**

**Plan, the pursuit of confirmation of this Plan, the Confirmation of this Plan, or the Consummation of this Plan; (vi) formulating, negotiating, or implementing the Prepackaged Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Prepackaged Plan; (vii) the administration of this Plan or the property to be distributed under this Plan, except for their fraud, gross negligence or willful misconduct as determined by a Final Order or with respect to any obligations of the Debtors, Estates, or the Plan Administrator under this Plan or the Sale Documents arising from and after the Effective Date, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting the Exculpated Parties from liability. The Confirmation Order shall serve as a permanent injunction against any Entity seeking to enforce any claim or cause of action against the Exculpated Parties that has been exculpated pursuant to Section 14.1(a) of this Plan.**

(b)     *Releases by the Debtors*. Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, each of the Debtors, on their own behalf and as a representative of their respective Estates, shall, and shall be deemed to, completely and forever release each and all of the Released Parties of and from any and all claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, their respective Assets, the Estates, the Chapter 11 Cases, the Prepetition Superpriority Lien Credit Documents, the Prepetition First Lien Credit Documents, the Prepetition Second Lien Credit Documents, the DIP Facility, any of the Debtors' in- or out-of-court restructuring efforts, the Sale Transaction, the Sale Documents, the Prepackaged Plan or this Combined Disclosure Statement and Plan, that may be asserted by or on behalf of any of the Debtors or their respective Estates, against any of the Released Parties. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any claims related to any act or omission that is determined by a Final Order to have constituted fraud, willful misconduct, or gross negligence. For the avoidance of doubt, the Debtors do not release any Preserved Causes of Action against LHCP Fund I or LHCP GP.

(c)     *Consensual Releases by Certain Parties*. As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties shall, and shall be deemed to, completely and forever release each and all of the Released Parties of and from any and all claims, Causes of Action, obligations, suits, judgments, damages, demands, debts, rights, remedies, and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, their respective Assets, the Estates, the Chapter 11 Cases, the Prepetition Superpriority Lien Credit Documents, the Prepetition First Lien Credit Documents, the Prepetition Second Lien Credit Documents, the DIP Facility, any of the Debtors' in- or out-of-court restructuring efforts, the Sale Transaction, the Sale Documents, the Prepackaged Plan or this Combined Disclosure Statement and Plan, that may be asserted by or on behalf of any of the Releasing Parties against any of the Released Parties (other than the rights of Holders of Allowed Claims to enforce the

obligations under the Confirmation Order and this Plan); *provided, however*, that nothing in this section shall operate as a release of (i) any causes of action or liabilities arising out of gross negligence, willful misconduct, or fraud, (ii) any obligations of the Debtors, Estates, or the Plan Administrator under this Plan or the Sale Documents arising from and after the Effective Date, or (iii) criminal acts of any such Released Party as determined by a Final Order.

*(d)*    **Non-Discharge of the Debtors; Injunction. In accordance with section 1141(d)(3) of the Bankruptcy Code, this Plan does not discharge the Debtors.  Section 1141(c) of the Bankruptcy Code nevertheless provides, among other things, that the property dealt with by this Plan is free and clear of all Claims and Interests against the Debtors.  As such, no Entity holding a Claim against the Debtors may receive any payment from, or seek recourse against, any assets that are to be distributed under this Plan other than assets required to be distributed to that Entity under this Plan.  All parties are precluded from asserting against any property to be distributed under this Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in this Plan or the Confirmation Order.**

        **Except as otherwise expressly provided for in this Plan or in obligations issued pursuant to this Plan, all Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Interest that has been released or exculpated in the Plan, from:**

        **(1)    commencing or continuing in any manner any action or other proceeding of any kind against any of the Estates, the Plan Administrator, their successors and assigns, and any of their assets and properties on account of such Claim or Interest;**

        **(2)    enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Estate, the Plan Administrator, their successors and assigns, and any of their assets and properties on account of such Claim or Interest;**

        **(3)    creating, perfecting or enforcing any encumbrance of any kind against any Estate, the Plan Administrator, their successors and assigns, and any of their assets and properties on account of such Claim or Interest;**

        **(4)    asserting any right of setoff or subrogation of any kind against any obligation due from any Estate, the Plan Administrator or their successors and assigns, or against any of their assets and properties on account of such Claim or Interest, except to the extent a right to setoff or subrogation is asserted with respect to a timely Filed Proof of Claim or exercised prepetition; or**

        **(5)    commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Interest or Cause of Action released under Article XIV of this Plan.**

        **Any Entity injured by any willful violation of such injunction may seek actual damages and, in appropriate circumstances, may seek punitive damages from the willful violator.**

**14.2    Term of Bankruptcy Injunction or Stays**. All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Cases.

**ARTICLE XV**
**RETENTION OF JURISDICTION**

**15.1    Exclusive Jurisdiction of Bankruptcy Court**. Pursuant to sections 105(a) and 1142 of the Bankruptcy Court, and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

*(a)*    allow, disallow, determine, subordinate, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (whether filed before or after the Effective Date and whether or not contingent, Disputed or unliquidated or for contribution, indemnification or reimbursement), including the compromise, settlement and resolution of any request for payment of any Claims or Interests, the resolution of any Objections to the allowance or priority of Claims or Interests and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim or Interest to the extent permitted under applicable law;

*(b)*    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date;

*(c)*    hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all Causes of Action, and consider and act upon the compromise and settlement of any Claim or Interest, or Cause of Action, including, without limitation, any Preserved Cause of Action;

*(d)*    determine and resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims arising there from;

*(e)*    ensure that all Distributions to Holders of Allowed Claims under this Plan and the performance of the provisions of this Plan are accomplished as provided herein and resolve any issues relating to Distributions to Holders of Allowed Claims pursuant to the provisions of this Plan;

*(f)*    construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and Consummation of this Plan and all contracts, instruments, releases, other agreements or documents created in connection with this Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of this Plan in accordance with sections 524 and 1141 of the Bankruptcy Code following the occurrence of the Effective Date;

*(g)*    determine and resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation, implementation or enforcement of this Plan

(and all exhibits and schedules to this Plan) or the Confirmation Order, including the exculpation, release, and injunction provisions set forth in and contemplated by this Plan or the Confirmation Order, or any entity's rights arising under or obligations incurred in connection therewith;

*(h)*    modify this Combined Plan and Disclosure Statement or the Confirmation Order before or after the Effective Date, pursuant to section 1127 of the Bankruptcy Code, as well as any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with this Combined Plan and Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan, to the extent authorized by the Bankruptcy Code and this Plan;

*(i)*    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with Consummation, implementation or enforcement of this Plan or the Confirmation Order;

*(j)*    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

*(k)*    determine any other matters that may arise in connection with or relating to this Plan, the Disclosure Statement, the Confirmation Order, the Sale Transaction, the DIP Facility, the Sale Order or any contract, instrument, release, or other agreement or document created in connection with any of the foregoing;

*(l)*    determine such other matters and for such other purposes as may be provided in the Confirmation Order;

*(m)*    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

*(n)*    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

*(o)*    determine and resolve controversies related to the Estates, the Debtors, the Plan Administrator or the Plan Administrator from and after the Effective Date;

*(p)*    hear and determine any other matter relating to this Combined Plan and Disclosure Statement; and

*(q)*    enter a final decree closing any or all the Chapter 11 Cases.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

**16.1    Modification of this Plan**. The Debtors may alter, amend, or modify this Plan or any exhibits or schedules hereto under section 1127(a) of the Bankruptcy Code at any time prior to or after the Confirmation Date but prior to the substantial Consummation of this Plan, *provided, however,* that any such alteration, amendment or modification does not materially and adversely affect the treatment of Holders of Claims or Interests under this Plan.  Any Holder of a Claim that has accepted this Plan shall be presumed

to have accepted this Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder.

**16.2     Revocation, Withdrawal, or Non-Confirmation of this Plan**. The Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Hearing.  If this Plan is revoked or withdrawn prior to the Confirmation Hearing, or if this Plan is not confirmed by the Bankruptcy Court, then:

> *(a)*     this Plan shall be null and void in all respects, and

> *(b)*     nothing contained in this Combined Plan and Disclosure Statement shall (i) constitute a waiver or release of any claims by or against, or any Interests in, the Debtors or any other Entity, (ii) prejudice in any manner the rights of the Debtors or any other Entity, or (iii) constitute an admission of any sort by the Debtors or any other Entity.

**16.3     Binding Effect**. Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of this Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under this Plan and whether or not such Holder has accepted this Plan.

**16.4     Subordination Rights**. The classification and manner of satisfying all Claims and the respective Distributions and treatments hereunder take into account and/or conform to the relative priority and rights of the Claims in each Class in connection with the contractual, legal and equitable subordination rights relating thereto, whether arising under contract, general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise.  All subordination rights that a Holder of a Claim may have with respect to any Distribution to be made under this Plan shall be implemented through this Plan, and all actions by such Holder of a Claim related to the enforcement of such subordination rights shall be enjoined permanently.  The provisions of any contractual or structural subordination of Claims shall remain enforceable by the Plan Administrator on behalf of the Estates after the occurrence of the Effective Date. Without limitation hereunder, the Plan Administrator, on behalf of the Estates, may likewise enforce any right of the Debtors or the Estates to equitably or otherwise subordinate Claims under section 510 of the Bankruptcy Code, which rights are deemed transferred to, remain and are preserved in the Post-Effective Date Debtors, except as otherwise expressly set forth herein or as expressly provided in a Final Order of the Bankruptcy Court in the Chapter 11 Cases.

**16.5     Severability of Plan Provisions**. If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**16.6     Payment of Statutory Fees; Filing of Quarterly Reports**. All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("**Quarterly Fees**") prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, all Quarterly Fees shall be paid when due and payable.  The Debtors shall file all monthly operating reports due prior to the Effective Date

when they become due, using UST Form 11-MOR.  After the Effective Date, the Plan Administrator shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  Each and every one of the Debtors and the Plan Administrator shall remain obligated to pay Quarterly Fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.  The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under this Plan.

**16.7    Exemption from Section 1146**. Pursuant to section 1146(a) of the Bankruptcy Code, under this Plan, (i) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors; or (ii) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan and/or the Sale Transaction, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be taxed under any law imposing a stamp tax or similar tax.  To the extent that the Debtors or Plan Administrator elect to sell any property prior to or after the Confirmation Date, such sales of property will be exempt from any transfer taxes in accordance with section 1146(c) of the Bankruptcy Code.  All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in the Chapter 11 Cases shall be deemed to be or have been done in furtherance of this Plan.

**16.8    Filing of Additional Documents**. On or before the Effective Date of this Plan, the Debtors may issue, execute, deliver, and File with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of this Plan.

**16.9    Insurance**. Confirmation of this Plan and the occurrence of the Effective Date shall have no effect on insurance policies of the Debtors in which the Debtors are or were insured parties. Each insurance company is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering, or delaying coverage on any basis regarding or related to the Chapter 11 Cases, this Plan or any provision within this Plan, including the treatment or means of liquidation set out within this Plan for insured Claims, if any.

**16.10    Cancellation of Existing Securities and Agreements**. On the Effective Date, except to the extent otherwise provided in this Plan, all notes, instruments, certificates, shares, bonds, indentures, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, and other documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in the Debtors giving rise to any rights or obligations relating to Claims or Interests, shall be deemed cancelled and surrendered without any need for a Holder to take further action with respect thereto. Except as otherwise provided herein, the terms and provisions of the Plan shall modify any existing contract or agreement that would in any way be inconsistent with Distributions under the Plan.

Upon the Effective Date, Interests in AeroCision Parent will automatically vest in, Reorganized AeroCision Parent; and the New Membership Interests in Reorganized AeroCision Parent will automatically vest in, and be issued to, the Plan Administrator.

**16.11    Successors and Assigns**. The rights, benefits and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

**16.12    Notices**. All notices, requests, and demands to or upon the Debtors shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually

delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors, to:

> Riveron Management Services, LLC
> 461 5th Avenue, 12th Floor
> New York, NY 10017
> Attn: David Nolletti, Chief Restructuring Officer (david.nolletti@riveron.com)
> Telephone: (212) 586-2200

with copies to:

> Young Conaway Stargatt & Taylor, LLP
> Rodney Square
> 1000 North King Street
> Wilmington, DE 19801
> Attn:    Michael R. Nestor (mnestor@ycst.com)
>          Andrew L. Magaziner (amagaziner@ycst.com)
>          Elizabeth S. Justison (ejustison@ycst.com)
> Telephone: (302) 576-3592
> Facsimile: (302) 575-3459

If to the First Lien Agent:

> Citizens Bank, N.A., as Administrative Agent
> 28 State Street
> Boston, MA 02109
> Attn:    Paul M. Mongeau (paul.m.mongeau@citizensbank.com)
>          Kolby D. Baker (kolby.d.baker@cititzensbank.com)
> Telephone: (617) 725-5900

with copies to:

> Choate, Hall & Stewart LLP
> Two International Place
> Boston, MA 02110
> Attn:    Douglas R. Gooding (dgooding@choate.com)
>          Jonathan D. Marshall (jmarshall@choate.com)
> Telephone: (617) 248-5277
> Facsimile: (617) 502-5277

After the Effective Date, the Debtors or Post-Effective Date Debtors, as applicable, shall be authorized to send a notice to Entities specifying that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity (excluding the U.S. Trustee) must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors or Post-Effective Date Debtors shall be authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee, those Entities who have filed such renewed requests and the Entities affected by any relief requested.

30926754.12

**16.13   Governing Law**. Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other federal laws is applicable, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection with this Plan, the construction, implementation and enforcement of this Plan and all rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles which would apply the law of a jurisdiction other than the State of Delaware or the United States of America.**Entire Agreement**. Except as otherwise indicated, this Plan (including the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.**Exhibits and Schedules**. All exhibits and schedules annexed hereto, and all documents submitted in support hereof, are incorporated into and are a part of this Plan as if set forth in full herein.  Holders of Claims and Interests may obtain copies of the Filed exhibits and schedules upon written request to the Debtors.  Upon their Filing, the exhibits and schedules may be inspected in the Office of the Clerk of the Bankruptcy Court or its designee during normal business hours.  The documents contained in the exhibits and schedules shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.  To the extent any exhibit or schedule annexed hereto is inconsistent with this Plan, the contents of this Plan shall control.**Computation of Time**. In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**16.17   Reservation of Rights**. The Filing of this Combined Disclosure Statement and Plan, any statement or provision contained in this Combined Disclosure Statement and Plan, or the taking of any action by the Debtors with respect to this Plan shall not be, and shall not be deemed to be, an admission or waiver of any rights of the Debtors with respect to the Holders of Claims and Interests.

Dated:  December 14, 2023                          Respectfully submitted,
             Wilmington, Delaware

                                                                    By: */s/ David Nolletti*
                                                                    Name: David Nolletti
                                                                    Title: Chief Restructuring Officer
                                                                    AeroCision Parent, LLC, on behalf of itself and all other Debtors

**EXHIBIT A**

**Liquidation Analysis**

**[TO COME]**